D. L. PHILIPPE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 36995. Filed August 31, 1956.

*Luke F. Binetti, Esq.*, for the petitioner.
*Richard G. Maloney, Esq.*, for the respondent.

#### OPINION.

KERN, *Judge:* The crucial question in this case is whether petitioner, during the taxable years, was a nonresident alien within the meaning of section 212(a), Internal Revenue Code of 1939, which provides that "In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States." It is stipulated that petitioner's income was only from sources without the United States and that he was not a citizen of the United States. Therefore, the validity of respondent's determination of deficiency must depend on the correctness of his contention that petitioner was a resident of the United States during the years in question.

Petitioner was an alien seaman. Therefore, it is relevant to consider not only the general provisions of Regulations 111, sections 29.211–2 and 29.211–4, but also the specific provisions of Regulations 111, section 29.211–3, which read as follows:

SEC. 29.211–3. ALIEN SEAMEN, WHEN TO BE REGARDED AS RESIDENTS.—In order to determine whether an alien seaman is a resident within the meaning of chapter 1, it is necessary to decide whether the presumption of nonresidence is overcome by facts showing that he has established a residence in the United States. Residence may be established on a vessel regularly engaged in coastwise trade, but the mere fact that a sailor makes his home on a vessel flying the United States flag and engaged in foreign trade is not sufficient to establish residence in the United States, even though the vessel, while carrying on foreign trade, touches at American ports. An alien seaman may acquire an actual residence in the United States within the rules laid down in section 29.211–4, although the nature of his calling requires him to be absent for a long period from the place where his residence is established. An alien seaman may acquire such a residence at a sailors' boarding house or hotel, but such a claim should be

carefully scrutinized in order to make sure that such residence is bona fide. The filing of Form 1078 or taking out first citizenship papers is proof of residence in the United States from the time the form is filed or the papers taken out, unless rebutted by other evidence showing an intention to be a transient. The fact that a head tax has been paid on behalf of an alien seaman entering the United States is no evidence that he has acquired residence, because the head tax is payable unless the alien who is entering the country is merely in transit through the country.

The question of residence under the quoted regulation is a mixed question of law and fact and its solution requires a determination of the subjective intent of the individual taxpayer ascertained from the careful consideration of the objective facts peculiar to each case. *Rolf Jamvold*, 11 T. C. 122. Many evidentiary factors are pertinent to a consideration of the question. See *L. E. L. Thomas*, 33 B. T. A. 725; *John Ernest Goldring*, 36 B. T. A. 779; *Walter J. Baer*, 6 T. C. 1195; *Herman F. Baehre*, 15 T. C. 236; and *Rolf Jamvold, supra.*

It should be further noted that the question is whether petitioner was a resident of the United States. A conclusion that he was not a resident of this country does not require that we determine in what other country, if any, was his residence.

Such questions, during and immediately after the last World War, were difficult to answer with reference to an uncounted multitude of persons who had, before the war, peacefully and unquestionably resided in Western Europe. With regard to no group were the questions more difficult of solution than the merchant sailors exiled from countries overrun by Hitler's Germany. See *Rolf Jamvold, supra.* And of this group it is difficult to conceive that many individuals could present a more complicated background for this problem than petitioner.

He was born in Canada and his parents were obviously of either French or Belgian origin. At the age of 10 he was brought to this country and lived in New York for 2 years until his parents separated. His mother, who, as petitioner testified, was quite a sensitive person and felt a "loneliness towards Europe" went to Belgium where she had relatives and took all the children with her. However, for some reason she stopped by London on her way to Belgium and placed petitioner and his brother in an English school, St. Aloysius College, where they stayed for 2 years. After that petitioner went to Belgium, where he lived with an aunt in Liege and later with his sister in Antwerp, and attended Belgian schools. On account of straitened family circumstances, he left school and went to sea sailing on board British ships out of Antwerp on account of his British citizenship. When the war came and Hitler conquered the Low Countries, his ship could not return to Antwerp. His mother, brother, and sister remained in Belgium. His father, from whom he had been separated

for some 10 years, lived in New York. War was engulfing the world and he was alone, a young sailor in his early twenties. He decided to keep to the sea and sail on British ships from English ports. Fortunately, he had friends living in Manchester, England, with whom he stayed between voyages and at whose houses he left his few personal belongings. In 1943, the course of the war found him stranded "due to lack of shipping" in Durban, South Africa, waiting for transport to England. He obtained a job on an American vessel which after operating in the Indian Ocean and Persian Gulf for some 6 months eventually brought him to New York. For some 6 to 7 months afterwards petitioner worked with the consent of the British Shipping Master on American ships sailing out of New York, and between voyages stayed with his father. He then obtained a position with the Army Transportation Corps, calling for 1 year's service in the European Theater of Operations and, after a period of training in diesel engines, became engineer on an oil tanker sailing out of Southampton, England, to various ports in France. Again, he stayed between voyages with his friends in Manchester. After this employment (and the end of hostilities in Europe) petitioner returned to New York and immediately took up service in the Southwest Pacific Theater of Operations on ships sailing out of Manila. This service continued until 1949.

We have set out this summary of petitioner's wartime service at sea to indicate how difficult it would be for petitioner to answer if he had been asked during this period: "Where is your residence?" It would be a difficult question for us to answer, if an answer were necessary in this proceeding. However, it is necessary for us only to answer the question whether petitioner was a resident of the United States. Our conclusion as to this question is that he was not a resident of the United States until 1949, when he returned to this country from the Pacific and decided to file his application for United States citizenship.

Respondent, in his contention to the contrary, stresses petitioner's stays with his father between voyages, during the time petitioner was sailing out of New York and between the time he came to this country from South Africa in 1943 and the time he began to sail on the oil tanker out of an English port in 1944, and his giving his father's address as his own when he registered for the draft and on other occasions when he might anticipate receiving communications from American officials.

The fact that over the period of approximately 1 year (out of the 7 here involved) the circumstances of petitioner's service at sea permitted him to spend short periods of time between voyages at his father's apartment does not persuade us that he was a resident of this

country. On these occasions he had a "definite intention as to his stay." He knew that he was staying only until his boat sailed again. He also had a "definite intention as to his stay" while he was taking training in diesel engines as preparation for his service with the Army Transportation Corps in the European Theater of Operations. These limited periods of physical presence in the United States as incidents in his wartime service as a sailor do not, in our opinion, justify a conclusion that petitioner was a resident of this country.

Nor do we think it persuasive of petitioner's residence in this country that he gave his father's address as his own mailing address on occasions when he might anticipate receiving communications from American officials.

We are more concerned by respondent's argument based upon the representations made by petitioner in the forms filled out and filed by him in 1949, in connection with his petition for naturalization. In these forms he stated that he had resided in New York since 1943.

With regard to this matter, petitioner testified as follows:

When a person becomes an American citizen, it is quite an occasion and when you are making up these forms, they appear pretty simple on the surface.

However, you become somewhat nervous over them and there are sometimes possible answers to the—different answers to the question.

I knew that I was making application under the Seamens' Act and that my legal entry in the United States was when I arrived from the Pacific area for purposes of citizenship and that is what I put down on this form.

However, I wasn't sure, it stated there, I believe it says, the first time you entered or when did you enter the United States. * * *

I wasn't sure if they meant when I was a boy, of which I don't remember very much or if they required my arrival in 1943, at which time I started sailing American vessels and there are usually a lot of people there and I stood in line and when I got to the lady that I could get this information from, I mentioned the fact that I was not sure what I should put in there and I mentioned the fact that I had come, I arrived at these shores in 1943 and that is the time I started sailing aboard American vessels.

Well, sometimes there is a lot of people and they are very short with the people asking questions and she says, well, put that down, and I had another question about my address and I said, well, I usually use my father's address, usually on all forms. She said, well put that down. But I wasn't too clear in my mind—I wanted to elicit a little information. She turned away from me and I began to feel somewhat stupid because it seemed simple but I had difficulty with the form.

I figured, well, the lady knows what she is talking about, that is what she wants and those are the things that I put down.

We were favorably impressed by the petitioner when he testified at the hearing herein. In our opinion he testified with candor and sincerity and his demeanor on the witness stand was that of a modest, sensitive, but capable young man. We accept his explanation of the statements made in these forms concerning his residence insofar as they refer to his residence prior to 1949. However, his acts and declarations clearly indicate that in 1949 he had the full intent to be

a resident of the United States. After being out of this country for over 4 years, he returned in October 1949 and immediately filed his first citizenship papers, which is proof of residence in the United States from the time the papers are taken out unless that fact is rebutted by other evidence showing an intention to be a transient. Regs. 111, sec. 29.211–3. An additional factor which we considered in holding that Philippe was a resident in 1949 was that he commenced studying for his marine engineer's license shortly after his return to this country, with the thought that he would reside in New York City because it was a good shipping port.

We conclude that the petitioner was a nonresident alien within the meaning of section 212 (a) of the Code during the taxable years 1944 to 1948, inclusive, but that he was a resident alien in the taxable year 1949.

As we have not sustained the Commissioner's determination of deficiencies for 1944, 1945, 1946, 1947, and 1948, the petitioner is not liable for the additions for failure to file timely returns for those years. The only remaining question is whether he is liable for the addition for his failure to file a timely income tax return for 1949. He filed a nonresident alien income tax return for 1949 on April 4, 1950. This should have been filed on March 15, 1950, as prescribed in section 53 (a) (1) of the 1939 Code. Philippe failed to show that this failure to timely file his 1949 return was due to reasonable cause and not due to willful neglect. He is, therefore, liable for the addition imposed by the provisions of section 291 (a) as determined by the Commissioner for 1949.

*Decision will be entered under Rule 50.*