Joyce de la Begassiere, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 60857. Filed February 25, 1959.

*Sidney Gelfand*, for the petitioner.
*Charles B. Markham, Esq.*, for the respondent.

1034

OPINION.

Murdock, *Judge:* The issue here is whether Joyce was entitled to file a joint return with her husband for the calendar year 1951, and section 51 (b) (2) of the Internal Revenue Code of 1939 makes that depend on whether or not the husband was a nonresident alien during all of the taxable year. The meanings of the words "nonresident" and "resident" depend to some extent upon the context in which they are used and, if in a statute, upon the purpose of the legislation. It is clear from the legislative history of section 51(b)(2) that Congress intended that no joint return should be filed unless both spouses had been residents of the United States for the entire tax year, but otherwise that history is not helpful. The best aids in determining the meaning of the word "nonresident" as used in section 51(b)(2) seem to be found in the Commissioner's Regulations and in the generally understood meaning of the word as found in standard dictionaries.

The Commissioner, in Regulations 111, section 29.211–2, has published a definition of "nonresident alien" as used in section 51(b)(2). The Regulation refers to "an alien actually present in the United States" and the permanence or lack of permanence of his stay. The section concludes with the following sentence: "An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances." An identical sentence has been in the Regulations since 1934. *John Henry Chapman*, 9 T.C. 619, 621. At all times that Jacques, an alien, was present in the United States during 1949, 1950, and the first 7 months of 1951, his stay in the United States was limited to a definite period by the immigration laws since the visas he had during that period limited his stay, first to 12 months and later to 24 months. The only circumstance explaining the fact that he was here on visas which limited his stay to

a definite period was that he never took the trouble to apply for a permanent visa. That could not be regarded as an exceptional circumstance. Cases involving an alien who could not obtain or who had adequate reason for not obtaining a permanent visa indicate what circumstances have been regarded as exceptional under this Regulation. *D. L. Philippe*, 26 T.C. 984; *Marsman* v. *Commissioner*, 205 F. 2d 335, affirming a Memorandum Opinion of this Court dated Feb. 21, 1950; *Cristina de Bourbon Patino*, 13 T.C. 816, affd. (C.A. 4) 186 F. 2d 962. Jacques was asked, "[W]hy didn't you apply for a permanent visa before that time [March 1951]?" And he answered, "I didn't give much thought to it because I always considered as a resident in the United States. I never thought of difference in visas." His other testimony indicates clearly, however, that he well knew the difference between a visa for a limited period and a permanent visa since he stated that each time he applied for a temporary visa he did not want to take the additional time which would have been necessary to obtain a permanent visa. The record shows that Jacques was never employed after he left Argentina in April 1949, and it was not for lack of available time or because of any exceptional circumstance that he did not apply for a permanent visa earlier. It was apparently due to indifference. Thus, it appears that there was an "absence of any exceptional circumstances" to account for the fact that his stay in the United States as an alien was limited to a definite period by the immigration laws, and the Commissioner's determination that he was a nonresident alien is supported by the Commissioner's Regulations and the facts in the case.

That determination is also supported by the facts in this case when considered with the usual meaning of "resident" and related words as given in current dictionaries. The noun "resident" is defined in Webster's New International Dictionary, Second Edition, Unabridged, G. & C. Merriam Company, 1950, as "One who resides in a place; one who dwells in a place for a period of more or less duration. *Resident* usually implies more or less permanence of abode." The adjective is defined in the same dictionary as "Dwelling, or having an abode, for a continued length of time; residing, as on one's own estate." The same authority defines "reside" "1. To settle oneself * * * in a place; * * * to remain or stay; * * * 2. To dwell permanently or continuously; to have a settled abode for a time." The definition of the noun "residence" includes the following: "Act or fact of abiding or dwelling in a place for some time; act of making one's home in a place."

Counsel for the petitioner criticizes his adversary's failure to name a place outside the United States of which Jacques was a resident at any time material hereto. He thus misconceives what the question is

and what is and who has the burden of proof. *D. L. Philippe, supra,* at 989. The question is: Was Jacques a resident of the United States during all of 1951? The petitioner has the burden of proof to show that he was. Counsel for the petitioner does not name any place in the United States where Jacques ever established any residence, if he deemed that necessary, but relies upon a general sort of understanding which Joyce and Jacques had at the time they were married that his future home, their future home, would be in the United States but they did not then decide where in the United States. It is obvious from the above definitions that a nonresident alien cannot establish a residence in the United States by intent alone since there must be an act or fact of being present, of dwelling, of making one's home in the United States for some time in order to become a resident of the United States. Some permanence of living within borders is necessary to establish residence. Cases involving the question of whether and under what circumstances a person with an established residence in a place ceases to be a resident of that place because of absence are not in point.

Jacques' purpose in coming to the United States was to marry Joyce and, as soon as that was accomplished, he left the United States and did not return for almost 2 years, except for 3 brief visits for purposes other than to establish residence. It might be argued that his residence would merge with Joyce's at some place in the United States under some circumstances, but such a contention would not be supported by the facts in this case. The couple left Joyce's home immediately after their marriage never to return for more than 2 years that we know of and with not only no intention to return to Houston for homemaking purposes but with mutual intention not to make their future home there.

Jacques never in any way made himself a resident of any community in the United States, as for example, by obtaining living quarters in or employment in or near any such community, by attending or joining any church or community activities, by applying for membership in any club or community group, or by indicating in any way his residence there, as might be helpful in proving residence.

He never had any dwelling of any kind in the United States which he ever intended to make his residence. He arrived first in Houston, Texas, after leaving Argentina. The record does not show how long he stayed there or where he had his living quarters while he was there, but it is clear that he never established any residence there and he never even intended to reside there. The testimony of both Jacques and Joyce shows that they had no intention of living with or near Joyce's parents in Houston, Texas. Joyce, being questioned with relation to their stay in Cuba and any obligation to come back to the United States said, "I was very happy to be independent, and I had

just gotten away from my family and I said, well, it might be better to be in Cuba. If I am here [in the United States] my mother will come poking in and see what is happening." Jacques testified, "We like better to live in New York than in Houston, certainly."

Jacques made a temporary visit to New York prior to his marriage, but he had no intention of remaining there, except to make at least a pretense of hunting for a job. He next went to Cuba and then returned to the United States, but where he stayed when he returned is not shown by the record. He was married in Houston on October 1, 1949. It seems clear that, as a single man, he never established any residence in the United States in anticipation of marriage or otherwise, never had any living quarters except those of a very temporary nature and did not become a resident of the United States within the usual meaning of that word as given in dictionary definitions.

Immediately after the wedding he and Joyce left Houston on their way to Cuba where they arrived a few days later. Neither of them was present in the United States at any time during the remainder of 1949. They rented a furnished apartment in Havana which they continued to occupy until April 14, 1950. They spent all of their time during 1950 outside of the United States, except for 2 weeks in New York visiting friends preliminary to their sailing for Europe. They did not enter the United States again until March 1951, when they came to Miami for about 2 weeks to buy a yacht. They had been occupying a rented house in Havana and they continued to occupy that house until about August 6, 1951. Meanwhile, however, they made another brief trip of about 3 weeks to Miami to take possession of the yacht and returned in it to Havana.

Jacques at all times from April 29, 1949, when he first arrived in the United States, until August 1, 1950, held a visa good for only a limited stay, and his stays during that time were for extremely limited periods. It was not until after August 6, 1951, that he was ever present in the United States on a permanent visa. He and Joyce left Cuba on August 6, 1951, and proceeded on the yacht to the vicinity of New York City where the yacht remained docked and they lived on it, for 6 or 7 months. It is not necessary for the purpose of this case to decide whether or not Jacques then became a resident of the United States because after the beginning of 1951 it was too late since the Code provides that no joint return shall be made if either the husband or the wife at any time during the taxable year is a nonresident alien.

Reviewed by the Court.

*Decision will be entered for the respondent.*

KERN, *J.*, dissenting: Two questions are involved in this case: (1) Did petitioner's husband become a resident of the United States in 1949, and, if he did, (2) did he abandon that residence in 1950 or 1951?

The majority opinion does not consider the two questions separately, but to the contrary recites facts *in extenso* occurring in 1950 and 1951, which are pertinent to the question of abandonment of residence, as if they were pertinent to the question of the acquisition of residence in 1949. Furthermore, in my opinion, it infers that in order for a person to become a resident of the United States he must have a permanence of abode "as on one's estate," and, indeed, the categorical statement is made in the majority opinion (without the citation of authority) that "[s]ome *permanence* of living within borders is necessary to establish residence." (Italic supplied.) This overemphasizes the concept of permanence of abode as a *prerequisite* to residence instead of treating it as only a factor for our consideration. In my opinion, if a person is physically present in the United States with the intent of living in the United States for an indefinite period, he may become a resident of the United States even if his place of abode shifts impermanently from hotel to hotel, or from city to city.

A more fundamental reason for my dissent is that I feel that the majority of my brethren have erred in giving undue weight to the criteria which might be pertinent and persuasive for the purpose of ascertaining the subjective intent of an individual in a consideration of the usual case involving residence, but which are beside the point under the unusual facts before us in this case.

Many of the cases involving the question of residence have been unusual because of extraordinary circumstances connected with the dislocation of usual relationships incident to global war. See, for example, *Ralph Love*, 8 T.C. 400; *Rolf Jamvold*, 11 T.C. 122; and *D. L. Philippe*, 26 T.C. 984. The instant case is unusual because of more exotic circumstances. In this case we are concerned with the young, beautiful, and charmingly naive petitioner, nee Joyce Blaffer of Houston, Texas, with an annual income of over $100,000, and her suave, handsome, and attractive husband, Jacques Adrien Marie Dubouays de la Begassiere. During the years pertinent to the problem before us their interest was focused on the pleasures arising from love, youth, and money. It is obvious from the record that they had little, if any, interest in the more mundane affairs of life which trouble the usual young couple concerned with the necessity of earning a living. They were under no compulsion to "settle down" after the wedding and honeymoon and face the problem of whether to rent an apartment close to the husband's job or buy a small house in the suburbs. Criteria available to us in considering the problem presented by more prosaic circumstances as, for example, membership in the local Lutheran church or Masonic lodge, see *Herman Frederick Baehre*, 15 T.C. 236,

are not helpful to us here. Nor does it seem important to me, as it seems to be important to the majority of my brethren, that Jacques failed to apply "for membership in any club or community group" or join in any "community activities."

In this case Jacques, who was a French citizen of good family, had been living in Argentina since 1941 where he had been earning his living in an export-import business. In March 1949, he met a young beautiful Texas heiress while she was making a tour of South America. They fell in love. They became engaged. They were eager to be married. In April 1949, after petitioner returned to this country, Jacques terminated all of his interests in Argentina, bought a one-way ticket to the United States, and followed her home with appropriate speed and ardor. Naturally (to use a word frequently on the lips of petitioner in her testimony before us), he entered the United States on the type of visa which was easiest and quickest to obtain. He was more interested in making a speedy entry than in his precise status as an enterer. Both petitioner and Jacques testified that at or about the time of their engagement they decided that they would reside in the United States even though Jacques retained his French citizenship. This testimony is uncontradicted, is credible, and is consistent with the facts of record. Petitioner had no reason to abandon her residence in the United States and it was natural for Jacques to make her residence his. Obviously, he wanted to be with her and it was not unnatural for him to wish to live near the corpora of her trusts. When Jacques entered this country in April 1949, he intended to become a resident of the United States, and he did actually live "within [the] borders" of this country, with the exception of a short trip to Cuba to investigate a business proposition, until October 1949 when he and petitioner were married and went on a honeymoon trip which lasted longer than was expected because petitioner inconveniently suffered an acute attack of appendicitis, requiring an operation. Of course he could not "establish a residence * * * by intent alone," but there was also an actual living in this country for an indefinite period by Jacques even though he had no permanent place of abode or "estate," and did not have a "dwelling * * * in the United States which he * * * intended to make his residence."

In my opinion Jacques became a resident of the United States in 1949. In that year he lived in the United States with "no definite intention as to his stay," having come to the United States not "for a definite purpose which in its nature may be promptly accomplished," but for a purpose "of such a nature that an extended stay may be necessary for its accomplishment." See Regs. 111, sec. 29.211–2(b). That purpose was to marry petitioner and to live with her happily forever afterwards. I think that the circumstances here were suffi-

ciently "exceptional" to make inapplicable the last sentence [1] of the quoted regulation.

Having concluded that Jacques established residence in the United States in 1949, I am further of the opinion that the visits of petitioner and Jacques to Cuba in later years, even though of extended duration, did not constitute action on the part of either which shows that he or she intended to abandon residence in the United States. Section 29.211-5, Regulations 111, provides that "[a]n alien who has acquired residence in the United States retains his status as a resident until he abandons the same." Such abandonment of residence is accomplished by actually departing from the United States (*ibid.*) "coupled with an intention to abandon the United States residence." (I.T. 4057, 1951-2 C.B. 93.) The testimony of Jacques and petitioner is to the effect that they did not intend to abandon their residence in the United States. The wedding trip to Cuba in October 1949 was not evidence of an intent to abandon such residence. It was made on a temporary 6-month tourist visa. Return tickets to the United States were deposited with Cuban authorities although the only requirement with regard to a noncitizen of the United States was that he deposit a ticket out of the country. The petitioner's husband during the wedding trip gained an extension of his nonpermanent visa to the United States. The fact that he did not apply for a permanent one only indicates a lack of forethought with regard to obtaining one and a desire to take the speedier course toward obtaining a visa at a time when his original 12-month visa was about to expire. He was able to acquire a 24-month extension in just 3 days—the longer course toward a permanent visa would have required a 3-month procedure. The subsequent activities of the couple in traveling to Europe, returning from Europe [2] to Cuba, and purchasing and sailing the yacht in Cuban waters in 1950 and 1951, were in their economic and social frame of reference consistent with residence in the United States and were not indicative of an intent to abandon such residence. The circumstance of a constant flow of income from petitioner's sizable interests in trusts which made such travels possible must be considered along with facts such as the lack of a house or business in the United States during the period of these activities. People of wealth may take long honeymoons in Cuba, visit in France, and spend the winter months in the Caribbean without abandoning their residence in the United States on account thereof within the meaning of the Federal tax laws. The only matter which

---

[1] "An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances."

[2] It should be pointed out that they returned from Europe to Cuba rather than to the United States (as they originally planned) because of lack of available shipping space to the United States due to the Korean War. Their ultimate destination continued to be the United States.

points to a contrary result is Jacques' interest in a Cuban mine. In my view Jacques' activities in connection with this mine were inconsequential and merely gave him an opportunity to play at being busy.

The representations as to residence made by petitioner's mother's accountant in the typewritten returns signed and filed by petitioner for the years 1949 and 1950 are, in my opinion, of little significance. Petitioner had no interest or experience in business affairs. These returns were prepared without any consultation with petitioner or her husband. Petitioner testified that she signed them without reading them and was not aware of any statement in them relating to residence. Considering her age, background, training, and the circumstances existing during the years in question, there is no reason to disbelieve this testimony. Accordingly, I would conclude that these statements have no probative value in determining the intention of petitioner and certainly no probative value in determining the intention of her husband with regard to the question of residence. See *D. L. Philippe, supra* at 991.