*Decision will be entered under Rule 50.*

DWINNELL & COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72989.    Filed February 8, 1960.

*Robert J. Johnson, Esq.*, for the petitioner.
*Robert A. Roberts, Esq.*, for the respondent.

FISHER, *Judge:* This proceeding involves deficiencies in personal holding company surtax and addition to tax under section 291(a) of the Code of 1939 determined by respondent for the taxable years 1951 and 1952 as follows:

| Year | Personal holding company surtax | Sec. 291(a) |
|---|---|---|
| 1951 | $8,759.95 | $2,189.99 |
| 1952 | 17,470.48 | 4,367.62 |

The issues presented are (1) whether petitioner has met the requirements of section 505(b) of the Code of 1939 with respect to allowance of expenses and depreciation in excess of rental received, and (2) whether petitioner has established that its failure to file personal holding company tax returns for the taxable years in question was due to reasonable cause and not to willful neglect.

Petitioner concedes there is a deficiency in its personal holding company surtax liability for the taxable year 1951 in the amount of $6,947.59.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by reference.

Petitioner is a Delaware corporation qualified to do business in the State of Minnesota. The principal office of the petitioner is located in Minneapolis, Minnesota.

Petitioner has only one class of capital stock consisting of 10,000 common shares. Petitioner's officers and shareholders during 1951 and 1952 were as follows:

| | Number of common shares | Position |
|---|---|---|
| James B. Dwinnell | 2,016 | Vice president. |
| Stanley W. Dwinnell | 1,610 | President. |
| William S. Dwinnell | 1,864 | Vice president. |
| Katherine D. Westen | 1,601 | |
| Virginia Westen Usher | 200 | |
| William L. Westen | 200 | Secretary. |
| Grace E. Clark | None | Treasurer. |
| | 7,491 | |
| Treasury stock | 2,509 | |
| Total | 10,000 | |

Stanley W. Dwinnell, James B. Dwinnell, and William S. Dwinnell are brothers and Katherine D. Westen is their sister. Virginia Westen

Usher and William L. Westen are the children of Katherine D. Westen.

Petitioner filed a "U.S. Corporation Income Tax Return" (Form 1120) for each of the calendar years 1951 and 1952. The return for the year 1951 was filed with the then collector of internal revenue for the district of Minnesota and for the year 1952 with the district director of internal revenue for the district of Minnesota. Petitioner maintains its accounting records and files its income tax returns using the cash method of accounting. Its income tax returns have always been filed on a calendar year basis.

Rents, dividends, and capital gains on the sale of securities constituted the principal sources of petitioner's income for the calendar years 1951 and 1952.

Prior to 1900, W. S. Dwinnell, Sr. (the deceased father of the present officer-shareholders, Stanley W. Dwinnell, James B. Dwinnell, and W. S. Dwinnell), acquired 156 acres of land, now known as Pine Tree Farms in Washington County, Minnesota. This land was taken over for Pine Tree Farms by petitioner in 1941. For many years prior to 1941, legal title to said land was held by Wildwood Park Realty Company, a Minnesota corporation, the outstanding shares of which are owned by the same persons who are shareholders of petitioner. Legal title to said land after 1941 continued to be held, and is now held, by Wildwood Park Realty Company.

Petitioner had no written lease or rental agreement covering its occupancy and use of Pine Tree Farms, and it has paid no rent as such for its use. However, in 1941, petitioner orally agreed to pay the applicable real estate taxes and to maintain and protect the property in return for its use. This oral agreement was not reduced to writing, although petitioner continued to pay the costs of maintenance and protection of the property.

Prior to 1941, Pine Tree Farms was wooded and had no improvements thereon. However, in 1941, petitioner commenced using the farms for raising poultry and production of eggs. These activities were partly in response to Government encouragement for increased egg production as a part of the war effort. Petitioner also expected to profit from the egg and poultry business.

Petitioner constructed buildings and improvements at said Pine Tree Farms between 1941 and 1948, consisting of some 30 buildings as well as a number of smaller shelters and brooder houses at an aggregate cost of $97,188.03. The buildings constructed at Pine Tree Farms were designed and constructed after considerable study and after consultation with an authority in the poultry industry. Petitioner obtained War Production Board priorities for the required construction materials.

From 1942 until early in 1951, petitioner actively engaged in the poultry- and egg-raising business at Pine Tree Farms. It produced high-grade eggs which were marketed largely on the east coast.

While there was some meat production initially, this was later abandoned. The farm purchased the chicks and feed needed in connection with its operation. It had a capacity of 8,000 birds and produced about 400 dozen eggs a day for the greater part of any year.

The farm was operated by a manager who resided on the premises. Stanley W. Dwinnell and W. S. Dwinnell spent considerable time working at the farm and did a substantial amount of supervisory work in connection with the farm operations. Said officers and other employees of petitioner enrolled in poultry- and egg-raising courses at the University of Minnesota Agricultural School. Pine Tree Farms contained no recreational facilities. No shareholder, officer, or director of petitioner ever resided at the farm or used the farm for recreational or entertainment purposes.

Petitioner never realized a profit from its poultry-raising and egg production operations at Pine Tree Farms. Petitioner's losses from such activities during the period it was so engaged were as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1942 | ($3,259.86) | 1947 | ($7,147.49) |
| 1943 | (13,871.98) | 1948 | (20,466.04) |
| 1944 | ( 7,302.40) | 1949 | (15,840.39) |
| 1945 | ( 7,416.61) | 1950 | (26,485.66) |
| 1946 | (11,685.77) | | |

During this period these unfavorable results were reviewed and discussed at various shareholders and directors meetings of petitioner. Consideration was also given to an alternative method of operation which necessitated starting a hatchery. This was not pursued due to cost and other factors. Petitioner's president and vice president attributed the operating losses of Pine Tree Farms to a price squeeze which was experienced during World War II years and to a general deterioration in the poultry and egg production industry which occurred in the years following the war. Information published by the Agricultural Marketing Service of the United States Department of Agriculture indicates that egg prices measured in constant dollar amounts as received by farmers had been drifting lower since the early 1940's.

At a special meeting of petitioner's stockholders, who are also the owners of Wildwood Park Realty Company, held on July 30, 1948, it was concluded that a farm sales agent should be employed to sell Pine Tree Farms which was owned by Wildwood Park Realty Company. Prior to February 1, 1950, petitioner employed a farm management company to sell Pine Tree Farms. No buyer was found.

Finally, at the adjourned annual meeting of the stockholders held on February 1, 1950, it was agreed that Pine Tree Farms operations should be discontinued in 1950. Department of Agriculture statistics

indicate a drop in egg prices of almost 20 per cent from 1949 to 1950. Accordingly, the purchase of chicks was discontinued in 1950, and operations were curtailed in that year and finally terminated in 1951. The decision to discontinue active operations of Pine Tree Farms was made in order to limit and reduce further out-of-pocket losses which would be incurred by petitioner as a result of the farm operations. Petitioner's loss on Pine Tree Farms in 1950 amounted to $26,485.66.

During 1951 and 1952, after active operation of the farm had been discontinued, substantial expenses were incurred by petitioner in the maintenance of Pine Tree Farms resulting in losses as follows:

| | 1951 | | 1952 | |
|---|---|---|---|---|
| Total receipts | $2,397.41 | | $1,388.02 | |
| Expenses: | | | | |
| Inventory: | | | | |
| (a) on Jan. 1, 1951 ..... $282.20 | | | | |
| (b) on Dec. 31, 1951 ..... 0 | | | | |
| | $282.20 | | | |
| Labor | 4,373.83 | | $7,425.64 | |
| Material and supplies | 4,980.67 | | 4,906.95 | |
| Miscellaneous | 516.03 | | 1,665.63 | |
| Freight | 16.84 | | --------- | |
| Insurance, light, power | 2,716.60 | | 1,665.28 | |
| Taxes | 1,538.95 | | 965.57 | |
| Depreciation | 6,198.66 | | 6,957.51 | |
| Care and repair of buildings | 3,306.31 | 23,930.09 | --------- | 23,586.58 |
| | | 21,532.68 | | 22,198.56 |

During 1951 and 1952, substantial efforts were made by petitioner to sell Pine Tree Farms; the property was advertised for sale; it was shown to a large number of prospective buyers; agents were employed to sell it, and a considerable number of possible purchasers were approached by petitioner's officers in an attempt to interest someone in the property. However, no offers to purchase the property were received. During the years 1951 and 1952, the residence at the farm was rented at a monthly rental of $30 to the former manager of Pine Tree Farms. As a condition of occupying the residence at such rental charge, the tenant agreed to serve as a watchman and protect the farm property.

Efforts were made to find a tenant for Pine Tree Farms during 1951 and 1952. Possible tenants were approached by petitioner's officers and the property was shown to prospects, but no actual tenant was found for any of the farm buildings until 1956, when two of the henhouses were leased for $300 per month for a 10-month period. Efforts by petitioner's president to extend the lease were unsuccessful.

In computing petitioner's subchapter A net income for 1951 and 1952, respondent, under section 505(b), disallowed deductions for expenses claimed under sections 23(a) and 23(l) of the 1939 Code

with respect to Pine Tree Farms to the extent that such expenses exceeded gross receipts. The amount disallowed for 1951 was computed in the notice of deficiency as follows:

| | | |
|---|---:|---:|
| Loss (per return) | | $21,532.68 |
| Less: | | |
| (a) Taxes | $1,538.95 | |
| (b) Inventory at Jan. 1, 1951 | 282.20 | 1,821.15 |
| Excess of expenses over income | | $19,711.53 |

The amount disallowed for 1952 was computed as follows:

| | |
|---|---:|
| Loss (per return) | $22,198.56 |
| Less: Taxes | 965.57 |
| Excess of expenses over income | $21,232.99 |

The rent and other compensation received by petitioner for the farm residence during 1951 and 1952 were the highest obtainable. No rent for the remainder of the property was obtainable during said years.

Pine Tree Farms and improvements thereon were held in the course of a poultry and egg business carried on bona fide for profit during all periods here material.

The property, including improvements thereon, was necessary to the said business.

Prior to 1951, neither petitioner nor any other corporations involving the Dwinnell family members was ever classified as a personal holding company, and petitioner has not been so classified subsequent to the year 1952.

Petitioner did not file personal holding company tax returns for the years 1951 and 1952. Its corporation income tax returns (Form 1120) for these years answered "No" to the question, "Is the corporation a personal holding company within the meaning of section 501 of the Internal Revenue Code?" Its officers did not become aware of petitioner's status as a personal holding company until 1955, when a revenue agent auditing the 1952 return so advised them.

Petitioner's income tax returns for the years 1949, 1950, and 1951 had been audited and some adjustments made prior to the time of filing of the 1952 income tax return. This audit was made in December 1952, and the results were known to petitioner's treasurer prior to the time of filing the 1952 corporation income tax return. No question had been raised, however, as to the petitioner's personal holding company status for 1951 by the auditing revenue agent in connection with that audit. In 1955, another revenue agent, in connection with the audit of petitioner's 1952 tax return, for the first time raised the question as to personal holding company status of petitioner for that year, and then went back to the petitioner's 1951 tax return and raised the same issue in that year.

Prior to 1951, petitioner's president had on some two or three occasions discussed the problem of personal holding company status in a general manner with a certified public accountant who served as the auditor for some of the companies in which the Dwinnell family members were interested. The accountant had told him that a corporation might become a personal holding company if its rents were less than 50 per cent of its total income. Petitioner's president understood total income for this purpose to mean the amount shown on line 15 of the U.S. Corporation Income Tax Return form. The accountant did not furnish Stanley W. Dwinnell any advice as to whether petitioner was a personal holding company.

Grace E. Clark, petitioner's treasurer, actually prepared petitioner's corporation income tax returns for the years 1951 and 1952. She is an officer of four other corporations owned by the Dwinnell family. Her training in tax matters was limited to her experience in making out returns beginning with 1917. She had been the treasurer of petitioner since it was organized in 1923 and, while aware of the personal holding company problem and having discussed it with Stanley W. Dwinnell, also understood that petitioner would not become involved as long as its rents exceeded 50 per cent of total income as shown on line 15 of its corporation income tax return. Petitioner's rents reflected on the 1951 U.S. Corporation Income Tax Return were $45,487.86, and the amount on line 15 was $89,021.17. The 1952 return showed rents of $77,820.35, and the amount shown on line 15 was $143,303.52.

Petitioner's rent income was materially depressed during each of the years 1951 and 1952, because of the destruction of the Majestic Hotel building, which property was owned by petitioner and had furnished a good portion of petitioner's rent income. Replacement of this building was not completed until 1952.

Although petitioner now concedes that it was a personal holding company in 1951 and 1952, it has not filed a personal holding company return for either of these years.

When petitioner's tax liability was under consideration by the Appellate Division of the Internal Revenue Service, petitioner's counsel, by a letter dated September 25, 1957, submitted all information concerning Pine Tree Farms operations in 1951 and 1952, required of personal holding companies by Regulations 118, section 39.505–1(e); and all information required by said Appellate Division in their consideration of the matter.

During 1955, petitioner employed a firm of certified public accountants to prepare its tax returns.

OPINION.

*Issue 1.*

Petitioner concedes that it was a personal holding company for the taxable years 1951 and 1952, under the provisions of section 501(a) of the Code of 1939.[1] Respondent disallowed deductions for depreciation, operation, and maintenance of Pine Tree Farms in excess of the rental received for the property under section 505(b) of the 1939 Code.[2] Petitioner claims that it has met all of the conditions in paragraphs (1), (2), and (3) of section 505(b) and, as a consequence, that respondent erred in such disallowance.

The burden of proof rests with petitioner to establish compliance with paragraphs (1), (2), and (3) "to the satisfaction of the Commissioner" subject, of course, to our review. We think petitioner has met this burden.

We come first to the question of whether or not petitioner has proved that the "rent or other compensation received was the highest obtainable, or, if none was received, that none was obtainable," as required by section 505(b)(1).

We have no doubt from the record that, in addition to efforts to sell the property, every reasonable effort was made to rent the property during the years in question. In the light of conditions facing peti-

---

[1] SEC. 501. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this subchapter and chapter 1, the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 502; but if the corporation is a personal holding company with respect to any taxable year beginning after December 31, 1936, then, for each subsequent taxable year, the minimum percentage shall be 70 per centum in lieu of 80 per centum, until a taxable year during the whole of the last half of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 70 per centum of the gross income is personal holding company income; and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the last half of the taxable year more than 50 per centum in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals.

[2] SEC. 505. SUBCHAPTER A NET INCOME.

(b) DEDUCTIONS NOT ALLOWED.—The aggregate of the deductions allowed under section 23(a), relating to expenses, and section 23(1), relating to depreciation, which are allocable to the operation and maintenance·of property owned or operated by the corporation, shall be allowed only in an amount equal to the rent or other compensation received for the use of, or the right to use, the property, unless it is established (under regulations prescribed by the Commissioner with the approval of the Secretary) to the satisfaction of the Commissioner :

(1) That the rent or other compensation received was the highest obtainable, or, if none was received, that none was obtainable ;

(2) That the property was held in the course of a business carried on bona fide for profit ; and

(3) Either that there was reasonable expectation that the operation of the property would result in a profit, or that the property was necessary to the conduct of the business.

tioner, as set forth in our Findings of Fact, it is not surprising that it was unable to rent the property as a whole, and we hold that no rent was obtainable except from the rental of the farm residence to petitioner's former manager. Since reasonable and substantial efforts were made to procure a tenant with no result except the arrangement with the former manager, the only conclusion we can reach is that the rent paid by him and the services performed by him represented the highest obtainable rent or other compensation. We have no doubt from the record as a whole that no substantial rent could have been procured for the property or any part of it during the years in question.

We hold, therefore, that petitioner has established compliance with section 505(b)(1).

We next turn to section 505(b)(2). We think it obvious that, despite repeated losses, the business here involved was bona fide carried on for profit, and that the property in question, including improvements made by petitioner, was held in the course of that business. Respondent argues that no business operations were carried on in 1951 and 1952. There is no doubt, however, that curtailed operations were carried on during at least part of 1951. We do not, however, think the statute contemplates only the carrying on of active operations. The property had not changed its character as business property, and the statute must have envisaged a reasonable period for purposes of liquidation. See *Alfred Kruse*, 29 T.C. 463 (1958); *Solomon Wright, Jr.*, 9 T.C. 173 (1947); *Carter-Colton Cigar Co.*, 9 T.C. 219 (1947). Cf. *W. T. Wilson*, 10 T.C. 251, 258, affd. 170 F. 2d 423 (C.A. 9, 1948), which is clearly distinguishable on its facts.

In the instant case, reasonable efforts were made to sell or lease the property during all of 1951 and 1952.

We hold, therefore, that petitioner has established compliance with section 505(b)(2).

Section 505(b)(3) sets forth two tests in the alternative. Compliance with the second test (i.e., that the property was necessary to the conduct of the business) is too obvious to require further discussion.

For completeness we refer to respondent's contention that title to the real estate was in the name of a corporation other than petitioner. We need not labor the point in view of the fact that section 505(b) refers to "property owned or operated by the corporation." It is clear that the property was operated by petitioner, and also that petitioner owned as well as operated the improvements which it placed on the property at considerable cost.

*Issue 2.*

The second issue involves respondent's determination of additions to tax under section 291(a) of the Code of 1939 [3] for failure to file personal holding company returns for the years 1951 and 1952. Petitioner concedes that it was (unwittingly) a personal holding company for each of said years. Petitioner's arguments in its attempt to negate willful neglect and show reasonable cause for failure to file may be summarized as follows: (a) Petitioner had no knowledge of its status as a personal holding company for the 2 years in question; (b) petitioner was not a personal holding company before or after the 2 years in question; (c) petitioner's officers were aware of the personal holding company category, and its president asked a certified public accountant what a personal holding company was, the president later innocently misinterpreting the accountant's answer to his general question; (d) the statute is complicated as evidenced by the fact that a revenue agent, after a field audit of the 1951 corporate return, failed to find that petitioner was a personal holding company for that year.

The statute imposing the addition to tax does not employ the criterion of good faith. *Hermax Co.*, 11 T.C. 442 (1948), affirmed per curiam 175 F. 2d 776 (C.A. 3, 1949). Thus, its officers' innocent ignorance of the fact that petitioner was a personal holding company does not meet the test of reasonable cause for failure to file a return. See *Mayflower Investment Co.*, 24 T.C. 729 (1955), affd. 239 F. 2d 624 (C.A. 5, 1956). Likewise, the fact that petitioner had not been a personal holding company prior to 1951 or after 1952, in no way controls the issue.

Petitioner's tax returns for the years 1951 and 1952 were prepared by its treasurer who was a bookkeeper for petitioner and for other companies in which the Dwinnell family had an interest. The record indicates that her tax training consisted solely of experience in preparing and filing various income tax returns since 1917. Petitioner's officers realized that personal holding company status might affect petitioner's tax returns. Instead of seeking professional advice on the specific matter, petitioner's president spoke in a general way about personal holding companies to a certified public accountant who told

---

[3] SEC. 291. FAILURE TO FILE RETURN.

(a) In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3612(d)(1).

him that personal holding company status was invoked when rents constituted less than 50 per cent of the total corporate income. This casual statement was interpreted incorrectly by petitioner's officers in preparing returns for 1951 and 1952. Viewing these facts, it cannot be said that petitioner's failure to file personal holding company tax returns was the result of consultation with knowledgeable tax advisers who were of the opinion that in this specific case no personal holding company tax return was due. See *Mayflower Investment Co.* and *Hermax Co.*, both *supra; Tarbox Corporation*, 6 T.C. 35 (1946); Cf. *Safety Tube Corporation*, 8 T.C. 757 (1947), affirmed on other issues 168 F. 2d 787 (C.A. 6, 1948); *Hatfried, Inc.* v. *Commissioner*, 162 F. 2d 628 (C.A. 3, 1947), reversing a Memorandum Opinion of this Court (Feb. 8, 1947); *O. Falk's Department Store, Inc.*, 20 T.C. 56 (1953).

In a system based upon self assessment, the duty of a taxpayer to file his return (with all information required) exists even though such a duty arises with respect to a "complicated" statutory provision. Here, no personal holding company returns were filed for the years in question, and the income tax returns filed not only did not, on their face, show the existence of personal holding company status, but the answer to question 6 on page 3 of each return relating to whether the taxpayer is a personal holding company was "No." We find no evidence that the first reviewing agent was put on notice of personal holding company status. On the other hand, petitioner itself had in its possession all of the information required for determining personal holding company status. That its officers misinterpreted the applicable facts and law does not relieve petitioner from the additions to tax in question.

In *Hermax Co.*, *supra*, where we also had before us a fact situation in which an agent audited a taxpayer's return and failed to find personal holding company status, we said (p. 445):

The fact that an internal revenue agent examined the income tax return of petitioner for 1943 and did not suggest that it was a personal holding company, is not material. Unlike the case of *Hugh Smith, Inc.*, 8 T.C. 660, there is no showing here that the internal revenue agent had before him a complete disclosure of all pertinent facts. Certainly the pertinent facts were not disclosed in the return itself.

This is also the distinction between this case and *Hatfried, Inc.* v. *Commissioner*, 162 F. (2d) 628, in which the court pointed out several times in the course of its opinion that the facts disclosed in the income tax returns filed by the taxpayer corporation operated to establish its status as a personal holding company.

In the instant case, the president of petitioner corporation, although an intelligent business man, turned over the tax affairs of the corporation, including the preparation of its Federal tax returns, to a public accountant who had been primarily employed to set up and keep the books of petitioner's stockholders and who was not an expert in Federal tax laws. No officer of petitioner had any reason to believe that the accountant was such an expert. In the tax returns

prepared by him for the petitioner, the question was directly asked, "Is the corporation a personal holding company within the meaning of Section 501 of the Internal Revenue Code?" The answer given in the returns was "No." These returns were signed by petitioner's president. No officer of petitioner ever considered this question, or consulted in regard to it, either with the accountant or with any one else. The accountant, without consulting any officer of the corporation or any trained counsel, decided that petitioner was not a personal holding company and prepared no personal holding company returns for filing within the time prescribed by law. In the Federal tax returns filed by petitioner, facts were not disclosed by which the personal holding company status of petitioner could be established. Under such circumstances, we are unable to conclude that the failure to file such a return is due to reasonable cause. Nor are we able to conclude that petitioner's officers, under the circumstances above described, acted with "ordinary business care and prudence."

On the basis of the foregoing discussion, we sustain respondent's determination of the additions to tax in question.

*Decision will be entered under Rule 50.*