HOWARD J. SOCHUREK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77217.    Filed April 21, 1961.

*Irving Lowe, Esq.,* for the petitioner.
*William J. Wise, Esq.,* and *James T. Wilkes, Jr., Esq.,* for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in petitioner's income tax for the year 1954 in the amount of $4,239.28.

The sole issue presented for our consideration is whether petitioner was a bona fide resident of the Crown Colony of Singapore or any other country of southeast Asia during the entire taxable year 1954 within the meaning of section 911(a)(1) of the Code of 1954.[1]

### FINDINGS OF FACT.

Some of the facts are stipulated and, together with exhibits, are found as stipulated.

Howard J. Sochurek, hereinafter sometimes called petitioner, filed his Federal income tax return for the year 1954 with the district director of internal revenue, Milwaukee, Wisconsin.

On petitioner's income tax return for the year 1954, which was signed and filed by his father acting under a power of attorney, the address of 5255 North Bay Ridge Avenue, Whitefish Bay, Milwaukee 17, Wisconsin, was inserted in the space designated "home address."

---

[1] Unless otherwise stated, all statutory references are to the Code of 1954.

On October 29, 1957, he executed a Form 870 extending the period of limitation upon assessment of income tax to June 30, 1959. In the body of said document, petitioner indicated that his address was 5255 North Bay Ridge Avenue, Whitefish Bay, Wisconsin.

At the time of the instant trial petitioner was single and 35 years old. He was born in Milwaukee, Wisconsin, and is a citizen of the United States.

While in high school Howard became actively interested in newspaper and photographic work. He also had part-time jobs with local commercial photographers and did some work for a local newspaper in Milwaukee.

From 1942 to 1946 Howard was in military service in the Army Signal Corps. After being commissioned he went overseas in the Pacific Area and served as a photo officer in the Philippines, Saigon, Okinawa, Japan, and China, as well as other countries throughout the Far East.

After discharge from military service in May 1946, petitioner returned to Milwaukee and secured employment with the Milwaukee Journal as a staff photographer until the end of 1948.

Beginning in 1948 Howard became associated with Life magazine, hereinafter called Life. He first worked out of the Detroit bureau of Life as a freelance photographer on a story-to-story basis.

Life maintains a separate foreign news service which is composed of a professional corps of foreign correspondents who spend their working time in foreign posts.

In 1950, at the time of the Korean war, Life gave petitioner a full-time staff position as a foreign correspondent in the southeast Asia area. Petitioner's employment contract was oral.

Howard spent the major portion of the 10-year period from 1950 to 1960 in foreign employment. In July 1950, he was assigned to cover the Korean war and selected Tokyo, Japan, as his base of operations. His assignment was indefinite. Howard worked on stories as they broke, many of them originating in the field. He rented a furnished hotel apartment-type suite of rooms which was operated by members of the Masonic Club.

In December 1951, petitioner gave up his living quarters at the Masonic Club and returned to the United States for a short vacation. During his sojourn he visited with his ailing mother whom he always tried to visit at Christmas time. Petitioner remained in the United States for consultation with his employer and made some speeches about the Korean war.

In April 1952, petitioner returned overseas for Life and was given the prerogative of selecting his base of operations. Petitioner established living quarters in a large apartment with another correspondent at 99–A Tacklyn Road in Singapore where he kept his equipment,

clothing, and furniture. They shared the rent. Petitioner made frequent trips out of Singapore to cover various assignments. Petitioner stopped sharing the rent with the other correspondent at the end of 1952.

In September 1952, while on an assignment in India, Howard contracted malaria. Desirous of moving out of the malaria area of Singapore, Howard went to work for the Chicago bureau of Life where he remained until June 1953.

Beginning in July 1953, Howard resumed his activities as a foreign correspondent for Life and did stories in France, Austria, Canada, and Newfoundland.

In October 1953 there was an intensification of the war in Indo-China and Howard was given an area assignment in the Far East extending from Korea to Indonesia. The assignment was for an indefinite period of time. Howard made his own decision as to his headquarters, and because of housekeeping and communication problems decided it was most practical to base in Singapore, a British Crown Colony.

In Singapore, Howard rented living quarters at 25 Brizay Park, a suburb of Singapore, from Dwight Martin, a fellow correspondent who worked for Time magazine. Martin contracted for the house, a large one containing four bedrooms and servants' quarters. Martin supplied most of the furniture. Howard's furniture was in storage in America at that time. Because of film and camera storage problems, Howard installed and personally paid $400 for two air-conditioning units. He also bought some dishes, end tables, and other minor household items. All of Howard's photographic equipment, which could not be carried with him on trips, was installed in said quarters. Howard paid Martin $1,000 a year as his share of the rent. Life did not pay any part of said rent. Howard also paid for his own food and living expenses at Brizay Park. Petitioner and Martin employed two houseboys and a laundry woman as servants. Petitioner personally paid for their services while he was in Singapore. Sometimes transient correspondents also lived at the house. Martin traveled on story assignments, but not as much as petitioner. On occasion, from November 1953 to December 1955, petitioner stayed in the house. During 1954, he spent about 25 days in Singapore.

Sometimes Howard also rented a room at the Raffles Hotel located in the center of Singapore to work, receive people, make contacts, and for other business purposes. The Brizay Park house had a telephone but the system was poor. Howard also received most of his mail at the Raffles Hotel, and his personal stationery was printed with this address. The expenses for the Raffles Hotel were paid for by Life.

While in Singapore, petitioner paid for his own personal expenses. His employer paid for his living expenses while away from Singapore. Life also paid for all office rental, company entertainment, and business expenses whether incurred by petitioner in Singapore, or away from Singapore.

During the period from November 1953 through December 1955, petitioner made many trips from Singapore to Indo-China where a war was in progress. During this period, petitioner did an essay on the Far Eastern religions, which took him to India, Ceylon, Burma, Indonesia, Formosa, and Japan. His assignments during 1954 also included stories regarding the American 7th Fleet which was patrolling the Formosa Straits and a Hong Kong story about American missionaries being evicted from Communist China. There was news stretching from the Formosa Strait down to Indonesia. Petitioner was the only Life reporter in southeast Asia and was responsible for the area coverage. Petitioner was very busy dashing from one place to another reporting the news. His overseas expense report for the year 1954 bears the designation "Bureau-Roving. S-E Asia."

Howard learned about news events or stories from various sources including social and business contacts which he had in the Far East. Also, stories would originate on Howard's own initiative or by direction from the New York office. There was very little direction from New York, and Howard was given freedom of operation with respect to stories and the method of his work. Singapore was a communications center and a good source of information regarding possible news stories, as were Hong Kong, Tokyo, and Hanoi. When Howard learned of a possible story he would immediately go to the area or city in which the event had occurred.

Generally, Howard would leave Singapore, pursue and accomplish the story in the specific area, return to Singapore, do the necessary writing and research, take a rest, and go out on another story. During 1954 petitioner was required to spend a great deal of time away from Singapore to carry on these activities. During the said year he returned to Singapore for more than 1 day only twice, and often traveled from one area of the Far East directly to another.

In June 1954 his employer put pressure on petitioner to leave Singapore as a base of operations and be placed under the direction of the Hong Kong bureau of Life. The projected move did not materialize and petitioner continued to operate in and out of Singapore.

Petitioner submitted monthly expense reports to Life during the years 1954 and 1955 which indicate that he was in the following places during the taxable year 1954:

| Date | Place | Date | Place |
|---|---|---|---|
| Jan. 1 to 4—Saigon | | June 28 to July 27—Hanoi and Saigon, Indo-China | |
| Jan. 5 to 7—Singapore | | July 28 to Aug. 6—Singapore | |
| Jan. 7 to 31—Colombo, Ceylon | | Aug. 6 to 18—Hong Kong | |
| Jan. 31 to Feb. 12—Delhi, India | | Aug. 18 to 31—Formosa | |
| Feb. 12 to 17—Rangoon, Burma | | Sept. 1 to 10—Manila | |
| Feb. 17 to 27—Mandalay | | Sept. 10 to 25—Taipeh | |
| Feb. 27 to Mar. 3—Rangoon | | Sept. 25 to Oct. 1—Saigon, Indo-China | |
| Mar. 3 to 12—Bangkok, Thailand | | Oct. 1 to 10—Hanoi | |
| Mar. thru Apr. 11—Japan | | Oct. 11 to 27—Travel between Saigon, Tokyo, Manila and Hanoi, Indo-China and Hong Kong | |
| Apr. 11 to 17—Hong Kong | | | |
| Apr. 17 to 27—Hanoi | | | |
| Apr. 27—Hong Kong | | | |
| Apr. 28—Tokyo | | Oct. 27 to Nov. 4—Singapore | |
| Apr. 30—United States | | Nov. 4 to 20—Bangkok, Hong Kong, Taipeh, Tokyo | |
| Remained in United States during May. On May 31 he was in travel status and arrived in Bangkok on June 4. | | Nov. 21 to 26—Travel status to United States | |
| June 5 to 9—Hong Kong | | Nov. 26 to Dec. 31—United States | |
| June 9 to 19—Hanoi | | | |
| June 19 to 27—Saigon | | | |

The expense accounts relating to the aforesaid trips were sometimes made up after 3 months of foreign travel. Some expense items are picked up on a month other than when actually incurred. As noted above, the expense reports show that from January through April 1954 petitioner was away from Singapore most of the time. The dates on the expense sheets do not necessarily mean that the petitioner was in that specific area on that date but sometimes only indicate that expenses were incurred in those places. If petitioner was away from Singapore on a story but wished to take some time off to return for a rest, he would do it at his own expense and, therefore, it would not appear as part of the travel voucher. This happened about twice.

The aforesaid expense vouchers show petitioner to be in Singapore between January 5 to 7; July 30 and 31; August 1 to 6; October 1 to 4; October 26 to 31; November 1 to 4.

While in Singapore, petitioner joined the Singapore Swimming Club and the Foreign Correspondents' Club.

Likewise, during his stay in Singapore, petitioner was a member of the local Catholic Church, and went to church on Sunday wherever he happened to be. He made contributions to the various churches he attended. He also made contributions to temples to obtain stories and charged them to his employer.

Also, while in Singapore, petitioner made social and business contacts. He established such relationship with the manager of the Singapore branch of the First National Bank. Petitioner also socialized with members of the local Chinese and British community. Petitioner hired interpreters when he did stories requiring the use of the Chinese language. Chinese is a major language in Singapore.

During his stay in Singapore, petitioner made a purchase of tailor-made clothes from a Singapore tailor.

During 1954, while in Singapore, petitioner paid the local consumer, house, and compensation taxes. He paid no income taxes to the Crown Colony of Singapore during the taxable year 1954.

On May 1, 1954, on the suggestion of his mother's physician, Howard returned on an emergency leave basis to the United States for a short visit to see his mother who had been hospitalized. Petitioner returned to Singapore before the end of May.

During 1954 Howard also spent the Christmas holiday in the United States with his parents. Petitioner is the only remaining child in his family. Petitioner's mother has arteriosclerosis and heart disease, and had considerable concern over her son's continued absence and welfare.

In 1955 petitioner became a member of the Overseas Press Club whose admission requirements are at least 2 years of continuous foreign coverage.

In 1954 Life magazine and Time, Inc., paid petitioner $16,033.30 for his services. No withholding tax was deducted.

Petitioner filed his 1954 Federal income tax return and claimed therein that the wages received from said employer were exempt from taxation. The return was signed and filed by petitioner's father under a power of attorney.

Petitioner's father also signed and filed an income tax return for petitioner for the years 1951 through 1953, inclusive.

In the early part of 1956 petitioner temporarily returned to the United States to do a story for Life on military and jet aviation. In May or June 1956, petitioner returned overseas to cover the Suez crisis and established living quarters at Lebanon. Petitioner maintained living quarters at the St. George Hotel, Lebanon, until the end of 1956.

In January 1957, petitioner was assigned to the Paris bureau of Life.

Howard leased an apartment in Paris at 86 Rue Perone on a long-term basis. Later he changed his apartment to 3 Avenue Ingres which he still maintains. He gives this address as his present residence.

In February 1958, Howard was granted a visa and proceeded to Moscow where he remained covering the Soviet Union until September 1959. Howard was subject to Soviet taxes during his stay there. The record does not state the nature of the tax.

In September 1959, petitioner was granted a fellowship at the Russian Research Center at Harvard and has been studying Soviet affairs at Harvard since that time. Petitioner took a temporary

leave from Life in order to accept the fellowship. The fellowship terminated in May 1960.

Petitioner still maintains his Paris apartment and pays rent under a long-term lease. Petitioner has paid French taxes for the years 1957 and 1958. The record does not state the nature of the tax.

Petitioner never owned any real estate in the United States.

OPINION.

Petitioner, a foreign news correspondent for Life magazine, seeks to exclude all salary received by him during 1954 on the ground that he was a bona fide resident of the British Crown Colony of Singapore during that entire taxable year under section 911(a)(1) of the Code of 1954.[2] Respondent, in opposition, contends that petitioner was in a "constant travel status" throughout that year, and, hence, was not a bona fide resident of Singapore or any other country of southeast Asia for an uninterrupted period which included all of 1954 within the ambit of the pertinent statute and the regulations promulgated thereunder.

The burden of proof rests with petitioner to establish compliance with section 911(a)(1), *supra*, "to the satisfaction of the Commissioner" subject, of course, to our review. *Frank Souza*, 33 T.C. 817, 825 (1960); cf. *Dwinnell & Co.*, 33 T.C. 827, 834 (1960).

Whether the taxpayer was a bona fide foreign resident within the purview of section 911(a)(1) is primarily a question of fact. In many instances, it is difficult to harmonize the decided cases. In the absence of any categoric statutory definition of the term "residence," each case must turn upon the particular attendant circumstances, often with borderline distinctions. *Frederick F. Hack*, 33 T.C. 1089; *Donald H. Nelson*, 30 T.C. 1151, 1153 (1958).

The legislative history leading to the enactment of section 911(a)(1), *supra* (and its counterpart provision, section 116(a) of the 1939 Code), and the judicial interpretations of the term "residence" are discussed fully in *Arthur J. H. Johnson*, 7 T.C. 1040 (1946), and *C. Francis Weeks*, 16 T.C. 248 (1951), and need not be repeated here.

At the outset we note that the statute does not define the term

---

[2] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

"bona fide resident." The elusive and variable nature of the word "resident" is pointed up by the court in *Weible v. United States*, 244 F. 2d 158, 163 (C.A. 9, 1957), where the court said that "residence * * * has an evasive way about it with as many colors as Joseph's coat." The noun "resident" is defined in Webster's New International Dictionary (2d ed. 1950), as "One who resides in a place; one who dwells in a place for a period of more or less duration. *Resident* usually implies more or less permanence of abode." The same authority defines "reside" "1. To settle oneself * * * in a place; * * * to remain or stay; * * * 2. To dwell permanently or continuously; to have a settled abode for a time." The definition of the noun "residence" includes the following "Act or fact of abiding or dwelling in a place for some time; act of making one's home in a place." Section 1.911–1 (a) (2), Income Tax Regs., states that whether petitioner was a bona fide resident of a foreign country shall be determined to the extent feasible under the principles set forth in section 871 and regulations thereunder. Section 871 relates to the income tax of nonresident aliens in the United States and section 1.871–2 (b), Income Tax Regs., is the applicable regulation thereunder.[3] Within the intent of section 911 (a) (1), a taxpayer need not be a domiciliary of a foreign country or countries to qualify as a resident thereof. *Herman Frederick Baehre*, 15 T.C. 236, 241 (1950). Conversely, mere physical presence in a foreign country for the specified period of time does not qualify a taxpayer as a resident of a foreign country within the intendment of section 911 (a) (1), *supra*. *Downs v. Commissioner*, 166 F. 2d 504 (C.A. 9, 1948), affirming 7 T.C. 1053, certiorari denied 334 U.S. 832 (1948).

When we adapt respondent's last cited regulation (footnote 3, *supra*) we find the question of whether or not a taxpayer is a "transient" or "sojourner" is to be determined by "his intentions with regard to the length and nature of his stay" in the foreign country. If he lived in Singapore and had no definite intent at all as to his stay, he would,

---

[3] Sec. 1.871–2, Income Tax Regs. DETERMINING RESIDENCE OF ALIEN INDIVIDUALS.—
* * *

*     *     *     *     *     *     *

(b) *Residence defined.*—An alien actually present in the United States [Singapore] who is not a mere transient or sojourner is a resident of the United States [Singapore] for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitue him a transient. If he lives in the United States [Singapore] and has no definite intention as to his stay, he is a resident. One who comes to the United States [Singapore] for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, [Singapore] he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States [Singapore] is limited to a definite period by the immigration laws is not a resident of the United States [Singapore] within the meaning of this section, in the absence of exceptional circumstances.

under the regulations, be considered to have been a resident. If he went to Singapore for a definite purpose, which, by its nature could have been promptly accomplished, he would not be a resident as the term is defined in the regulations. But if the purpose of his stay in Singapore was of such a nature that an extended stay there was necessary for its accomplishment, and because of that he made his home there temporarily, he would be a resident of Singapore within the meaning of the regulations.

It has been held that the correlative regulations of section 911(a)(1), *supra*, are "especially authoritative" and entitled to great weight since they serve to implement a purpose not set forth in detail. *Seeley* v. *Commissioner*, 186 F. 2d 541, 543 (C.A. 2, 1951), affirming in part 14 T.C. 175 (1950); *Leigh White*, 22 T.C. 585, 590 (1954).

Petitioner contends that prior to and including the taxable year involved he intended to reside and work outside the United States as a foreign correspondent, that in 1953 he went to Singapore for his employer on a permanent job of indefinite duration which anticipated an extended stay in Singapore; that although he spent "very few" days there in 1954, he intended Singapore to be his permanent overseas base and residence; and that his temporary absences were always linked with a positive intention to return. In essence, he argues that in 1954 all of southeast Asia was his "beat," and because he was obliged to dash from one country to another in a so-called fire brigade operation reporting the news, he was kept away from his residence in Singapore most of the year.

In our opinion, Howard intended to use Singapore as his base of operations in southeast Asia during the year in question. He has not proved that he intended to reside there within the scope and intendment of the statute. That his employer considered him a foreign resident and took no withholding tax from his wages during 1954 is, of course, not determinative. A taxpayer may be dedicated to a career of employment abroad and have extensive experience in foreign posts and yet not be a bona fide resident of a particular country or countries within the ambit of section 911(a)(1). *Ernest Rudolph Hertig*, 19 T.C. 109, 113 (1952); *Downs* v. *Commissioner, supra.* See *Joyce de la Begassiere*, 31 T.C. 1031 (1959), affirmed per curiam 272 F. 2d 709 (C.A. 5, 1959), where the issue of alien residence in the United States was involved. After adopting a dictionary definition of "residence," we said (p. 1036):

It is obvious from the above definitions that a nonresident alien cannot establish a residence in the United States by intent alone since there must be an act or fact of being present, of dwelling, of making one's home in the United States for some time in order to become a resident of the United States. *Some permanence of living within borders is necessary to establish residence.* * * * [Emphasis added.]

Intention to establish or acquire bona fide residence is to be determined primarily by the taxpayer's activities within the particular foreign country or countries.

In *Downs* v. *Commissioner, supra* at 508, the court rejected the idea that "mere presence other than sojourning in the foreign lands for the full tax year ripens the right to the exemption" and expressed the view that unless the taxpayer identifies himself to some degree in the social and cultural life of the foreign community he is not a resident of the particular foreign country in which he is staying temporarily.

Similarly, in *Meals* v. *United States*, 110 F. Supp. 658 (N.D. Calif. 1953), the court said at page 567:

The Committee sought to embrace in the term "bona fide resident" all whose assimilation into the foreign life was sufficient to expose them to the burdens of adjusting to the foreign environment.

We note that petitioner's oral agreement of employment with his editors (made just prior to his leaving for Singapore in November 1953) did not include any discussion with reference to the permanency of his position, nor was there any understanding as to the probable length of time he would be stationed in the Far East.

The strongest argument in petitioner's favor is that he paid $1,000 during the year in question as his share of the rent for a house which his colleague had rented in a suburb of Singapore. The significance of this factor is greatly reduced, however, by the fact that petitioner's testimony shows that he spent "very few days" in Singapore in 1954 and his travel vouchers, which present a graphic picture of his whereabouts during 1954, establish that he was actually in Singapore only about 25 days during that entire year. The actual use of the house by him was largely for the storing of materials which he could not take with him on trips.

In an endeavor to demonstrate the degree to which he had integrated with the foreign community, petitioner has enumerated several activities during his stay in Singapore, the details of which are recited in our findings and need not be reviewed here. Suffice it to say we have carefully considered each of them separately and in the aggregate and do not find them persuasive. Significantly, petitioner did not introduce any evidence as to the particular year in which he engaged in several of the social and economic activities involved. Unless these activities are tied to the taxable year 1954 or the last 2 months of 1953, it is not material to the determination of his residency in 1954. Petitioner testified that during the period he was in the Far East, that is from November 1953 to December 1955, he joined the Singapore Swimming Club and the Foreign Correspondents' Club. He failed, however, to indicate the year in which he joined these

clubs. Nor did he indicate the year in which he joined the local Catholic Church, or made contacts with the police, government officials, or business contacts. It is not clear from the record to what extent membership in the aforesaid clubs engendered social contact between petitioner and natives of Singapore. *Joseph A. McCurnin*, 30 T.C. 143, 149 (1958). Also, while petitioner testified that he attended church in Singapore during 1954, it is evident that he could not have attended there more than twice during the entire year. Furthermore, several of petitioner's activities on which he relies (such as renting an automobile on a monthly basis, purchasing tailormade clothes, renting a local apartment, and printing personal stationery) are not so identified with the stability of foreign residency that they would be uncommon to a transient foreign correspondent.

As to economic burdens, petitioner paid no income taxes to the Crown Colony of Singapore and personally incurred only the excise type of taxes which all taxpayers incur in the United States. While, of course, not conclusive, this is a factor to be weighed in determining foreign residence. *Ernest Rudolph Hertig, supra* at 113–114.

Petitioner, in our view, has failed to demonstrate that he was subjected to any greater burdens or responsibilities than those to which a transient or sojourning correspondent would have been subjected. He has shown no social or economic contacts in Singapore which a nonresident correspondent could not show. *Frank Souza, supra* at 825. Obviously Singapore was petitioner's base of operations or communication center where, through social and business contacts, he obtained news leads. He was at all times subject to instantaneous changes of assignment at the direction of his employer, and he actually spent most of the year in a travel status. In each country that he visited he was in fact "a mere transient or sojourner." Sec. 1.871–2, *supra.* Although his stay in Singapore may have been in a sense indefinite, it was at the same time temporary. See *Slaff* v. *Commissioner*, 220 F. 2d 65 (C.A. 9, 1955), affirming on this issue a Memorandum Opinion of this Court.

There is no evidence, nor is any claim made, that petitioner was a bona fide resident of any other foreign country during 1954.

In support of his contention that intention is the controlling factor, petitioner relies *inter alia* on *Swenson* v. *Thomas*, 164 F. 2d 783 (C.A. 5, 1947); *Audio G. Harvey*, 10 T.C. 183 (1948); and *Lois Kaiser Stierhout*, 24 T.C. 483, 487 (1955). We have carefully considered these cases and find them distinguishable on their facts. In *Swenson* and *Harvey*, where the exemption was allowed, the taxpayer established no fixed home in Colombia, South America, and his work required him to be ever on the move. However, the taxpayer spent several years within the particular foreign country and

paid income taxes there. In both cases, the courts considered the fact that the taxpayer was sufficiently burdened with the obligations of foreign residence and had integrated himself sufficiently into the foreign environment to be considered a resident. Equally distinguishable is *Stierhout* where the taxpayer, an employee of UNRRA, a rehabilitation agency in war-ravaged Germany, married a man with a European background, established a home there, and might have continued to live abroad indefinitely if he had not been transferred to the United States.

As indicated *supra*, petitioner must establish to the satisfaction of the Secretary or his delegate that petitioner was a bona fide resident of a foreign country or countries for an uninterrupted period which included an entire taxable year. Respondent has determined that petitioner has not brought himself within the exemption provisions of section 911(a)(1). We agree with respondent's determination. We hold, upon the entire record, that petitioner has not established to our satisfaction that he has met the requirements of section 911(a)(1).

*Decision will be entered under Rule 50.*