JOSETTE J. F. VERRIER FRIEDMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81516.   Filed December 22, 1961.

*Louis Sternbach, Esq.*, for the petitioner.
*Howard B. Sweig, Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined deficiencies in petitioner's income tax for the taxable years 1952 and 1953 in the respective amounts of $684.77 and $906.

The issues presented for our consideration are: (1) Whether petitioner was a resident or nonresident alien of the United States during the taxable years 1952 and 1953 within the meaning of section 211 of the Code of 1939; and (2) if petitioner was a resident alien of the United States during said years, whether funds expended by her for transportation, meals, lodging, tips, and miscellaneous expenses are deductible as expenses of travel, meals, and lodging while away from home under sections 22(n)(2) and 23(a)(1)(A) of the 1939 Code.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Josette J. F. Verrier Friedman, hereinafter called petitioner, a married woman, resides at 220 West 13th Street, New York 11, New York.

During the taxable years 1952 and 1953 petitioner was not married. Her maiden name was Josette J. F. Verrier.

For the taxable years involved herein, petitioner filed individual income tax returns with the district director of internal revenue, Baltimore, Maryland.

Petitioner was born in Vichy, France, on November 17, 1921, and resided with her parents at their home in Vichy until March 21, 1945.

The education which petitioner received in France provided her with the equivalent of a bachelor of arts degree. From December 1, 1940, until March 1, 1944, she was employed as a secretary by an international news correspondent in Vichy.

From March 21, 1945, until August 31, 1946, petitioner was employed as a secretary by Headquarters Command, Western Base Section, United States Forces, European Theater, Paris, France.

On October 7, 1946, she was employed by the United States Occupation Forces, Zone of Germany, initially serving as secretary to the Chief, Fiscal Division. For the next 3 years, petitioner was employed at Hoechst, Germany, and other cities in Germany which variously served as command headquarters. On January 14, 1950, petitioner resigned from her position in order to immigrate to the United States. On December 27, 1949, she executed an "Application For Immigration Visa and Alien Registration" with the American consulate at Munich, Germany. In this document, petitioner alleged: "That my purpose in going to the United States is to reside * * * [and that] I intend to remain permanently."

On January 19, 1950, the American Foreign Service in Munich, Germany, approved petitioner's application for immigration visa and alien registration, and issued to her a nonpreference quota, immigrant visa, which was valid for a period of 4 months.

The Immigration and Naturalization Service of the Department of Justice issued a certificate of arrival, dated May 4, 1951, certifying that petitioner, an alien, was lawfully admitted to the United States (in New York City, New York) on April 5, 1950, for permanent residence.

Upon petitioner's arrival in New York City on April 5, 1950, she lived with American friends at 3457 73d Street, Jackson Heights, New York. Except for a period of not more than 3 months, she continuously resided at the above address until April 3, 1952.

After arriving in the United States, petitioner was employed for a short period as a nurse's aide. From September 1950, until March 28, 1952, she was employed as secretary to an executive of Pearson's International, Inc., a firm of importers and exporters with New York offices. Petitioner's responsibilities during that time included administration and the supervision of several clerk employees.

On May 3, 1951, petitioner executed and filed a document with the Immigration and Naturalization Service entitled "Application for Certification of Arrival and Preliminary Form for a Declaration of Intention." Petitioner therein alleged that on April 5, 1950, she lawfully entered the United States for permanent residence.

On June 6, 1951, petitioner executed a declaration of intention which she filed on that date in the United States District Court for the Southern District of New York. Petitioner therein alleged under oath that she lawfully entered the United States on April 5, 1950, for permanent residence in this country; and that it was her intention to become a United States citizen, and reside permanently in the United States.

On November 8, 1951, petitioner executed an application for overseas employment with the domestic engineering firm of Porter-Urquhart, Associated, hereinafter sometimes called Porter-Urquhart. Said firm had obtained a contract from the United States Army Corps of Engineers relating to the construction of five major airbases for the United States Government in French Morocco. In connection with the performance of that contract, Porter-Urquhart joined forces with the New York City architectural firm of Skidmore, Owings & Merrill, Associated, on a joint venture basis. The joint venturers were known as Porter-Urquhart & Skidmore, Owings & Merrill, Associated.

All costs incurred by the joint venturers incident to contract performance were reimbursed by the United States Treasury Department. In connection with the construction project, it was necessary for the joint venturers to send a substantial number of technical construction and administrative personnel to French Morocco.

On April 3, 1952, petitioner executed a written contract of overseas employment with the joint venturers (referred to as "Consultant" therein) incident to the airbase construction projects in French Morocco. Pertinent provisions thereof are as follows:

SECTION 2. Term of Agreement.

The term of this agreement shall be the period. during which the services of the Employee are required. No definite period of employment is assured; however, after twelve (12) months' continuous employment from the date of this agreement, the Employee may terminate his employment hereunder by giving the Consultant written notice * * *.

# 542

SECTION 3. Compensation.

(a) The Employee is employed at the monthly rate above specified, payable in whole or in part, as the Employee may designate, by check on a bank in the United States and the balance in foreign currency of the country where the work is being performed at the then current legal rate of foreign exchange as is determined by the Contracting Officer. All salary shall be paid not less frequently than semi-monthly. Salary payments shall be subject to deductions required by law, all deductions expressly provided for herein, and all deductions authorized by the Employee and approved by the Contracting Officer.

\*          \*          \*          \*          \*          \*          \*

SECTION 5. Travel Pay.

Travel pay will accrue while the Employee is en route, on direction of the Consultant, from the point of hire to the site of the work, on the return trip from the site to the point of hire, and while awaiting transportation at the site of the work, or any point intermediate between the point of hire and the site of the work, or return. Such travel pay shall be paid on the basis of the Employee's monthly salary rate. Travel pay shall not accrue during stopovers resulting from the Employee's voluntary act or disregard of the Consultant's instructions, or during deviations made for the Employee's personal convenience.

SECTION 6. Transportation and Travel Expense.

(a) Transportation. Except as provided in Section 10 hereof, the Consultant shall furnish transportation from the point of hire to the site of the work, and, upon completion of the period of service, or upon medical release, as provided in Section 8 hereof, return to the point of hire. Transportation shall be by such method (air, rail, automobile or water), class (pullman for overnight rail travel, if available), schedule and route as the Consultant may designate or approve. If the Consultant authorizes the Employee to furnish any part of his transportation, reimbursement therefor will be made to the extent authorized upon the presentation by the Employee of such evidence of expenditure as the Consultant may require.

(b) Baggage. Cost of transportation of personal baggage (exclusive of tools required by the Consultant), exceeding the weight or size of that carried by the carrier without charge, shall be borne by the Employee at his own expense, unless the Consultant issues written authorization for the taking of excess personal baggage by the Employee.

(c) Subsistence. The Consultant will pay a subsistence allowance at the rate of Nine Dollars ($9.00) per day for each day during which the Employee is in travel status, pursuant to Section 6a hereof, from the point of hire and return thereto, except as provided in Section 10 hereof. No subsistence allowance shall be paid when subsistence and quarters are furnished, or during stop-overs resulting from the Employee's voluntary act or disregard of the Consultant's instructions except as noted hereinafter \* \* \*.

SECTION 7. Jobsite Facilities.

Board, Lodging and such hospitalization, medical services and temporary dental care as may be desirable, in the opinion of the Consultant's representative designated for that purpose, to keep the Employee in condition to render proper services, will be furnished by the Consultant at the site of the work to the extent authorized by the Contracting Officer and at a charge approved by him, which charge shall not exceed the sum of One Dollar and Fifty Cents ($1.50) per day. In those areas where laundry facilities are operated by the Consultant, the Consultant will, to the extent authorized by the Contracting Officer, make such facilities available to the Employee as a part of the above charge. The Employee hereby authorizes the Consultant to deduct all such charges from any

payments otherwise due to the Employee hereunder. During the initial period of organization and at such other times as the above facilities are not furnished to the Employee, it may be necessary for the Employee to secure his own board and lodging. At such times, the Employee will be given an allowance for board and lodging, the amount to be determined by the Contracting Officer.

\* \* \* \* \* \* \*

SECTION 9.   Return Transportation Fund.

(a) The Consultant may withhold, as a return transportation fund, not in excess of twenty-five per cent (25%) of each salary payment earned by the Employee under this agreement, following his arrival at the jobsite, until a reserve of Five Hundred Dollars ($500.00) shall have been set aside, which fund shall be paid to the Employee upon the completion of twelve (12) months' service hereunder; provided, further that if the Employee quits or is discharged for cause prior to the completion of said period of service, then all monies due the Employee at the time of such quitting or discharge shall be added to and become a part of said return transportation fund to the extent necessary to bring it up to said sum.

(b) If the Employee quits or is discharged for cause prior to the completion of said period of service, the Consultant may apply such fund to the payment, on behalf of the Employee, of his costs of living, transportation and other expenses incidental to the Employee's return to the United States; and any part of said fund not so used shall be paid over to the Employee. If this agreement is terminated by the Consultant prior to the completion of said period of service, for reasons other than those covered by Section 10 hereof, the fund shall be paid to the Employee upon such termination.

SECTION 10.   Termination of Employment.

The Employee agrees that if he quits or is terminated for cause prior to completion of twelve (12) months' service hereunder, the Consultant's obligations to the Employee shall cease on the date of such quitting or termination for cause, and the Employee shall pay his transportation costs and other expenses for his return to the United States.   \* \* \*

\* \* \* \* \* \* \*

SECTION 12.   Military Authority.

The Employee understands that the various sites of the work may be under the supervision of military authority. The Employee agrees that any act or omission by the Consultant inconsistent with the provisions hereof, shall be excused if such act or omission shall result from the compliance by the Consultant with any order or regulation of any miltary authority; provided, that the monthly salary, as hereinabove stipulated shall not be suspended.

SECTION 13.   Disclosure of Information.

The Employee is charged with knowledge that disclosure of any secret, confidential or restricted information, to any person not entitled to receive it, or his failure to safeguard any such information that may come within his knowledge, may subject him to criminal liability under the Federal Espionage Act.

SECTION 14.   Working Conditions.

\* \* \* \* \* \* \*

(c) The Employee shall comply with all laws and regulations, both Civil and Military, applicable at the site of the work and the vicinity thereof, and such other rules and regulations as the Contracting Office and the Consultant may establish from time to time with respect to the personnel employed by the Consultant. \* \* \*

\* \* \* \* \* \* \*

SECTION 16. Personal Property.

(a) The Employee shall provide all clothing and personal equipment necessary to enable him to perform this agreement; provided, however, that unless authorized in writing by the Consultant, the Employee shall not furnish and bring with him clothing and other property of a value in excess of Two Hundred Fifty ($250.00) Dollars. * * *

\* \* \* \* \* \* \*

SECTION 18. Foreign Income Tax Payment.

(a) Any income tax paid to a foreign government may be offset against income tax payable to the United States on the same income. If, at any time during the period of this agreement, the rates of the French Moroccan income tax are increased to a point where they exceed the rates of the United States income tax applicable to the same amount of income, the Consultant will pay to the Employee as additional compensation, an amount equal to the excess of the French Moroccan income tax over the United States income tax computed on the same amount of income provided, however, that if the employee is exempt from payment of United States income tax, such excess shall be determined by utilizing the United States income tax computed on such employee's earnings under this agreement.

Prior to her departure from the United States, petitioner was aware of the fact that the joint venturers had five sites of construction activity in French Morocco. Petitioner was also aware of the fact that she would initially be assigned to work in Casablanca, and thereafter, be assigned to work and live on one of the five construction sites. At this time, she was also familiar with the type of climate which existed in French Morocco.

On April 3, 1952, petitioner advised the joint venturers in writing, *inter alia*, that: (a) She had read her employment contract; (b) she was fully aware of its provisions particularly those dealing with return transportation, housing, living allowances, and the general living conditions in French Morocco, and (c) she had been told that 25 percent of her salary would be held in a return transportation fund until the total accumulated amounts equaled $500.

Preparatory to her contemplated employment with the joint venturers in French Morocco, on March 11, 1952, petitioner executed and filed a document (Form N-470) with the Immigration and Naturalization Service, entitled "Application for the Benefits of Section 307(b) or 308, Nationality Act of 1940" (54 Stat. 1142-1143; formerly 8 U.S.C. secs. 707(b), 708). Petitioner therein alleged under oath, *inter alia*, that: (a) She was an alien lawfully admitted to the United States for permanent residence on April 5, 1950; (b) she resided in the United States for 2 years after her lawful entry; (c) her employment under contract with the joint venturers would necessitate her presence in Casablanca, French Morocco, from April 1, 1952, to April 1, 1953; (d) her absence from the United States for said period was on behalf of the United States Government; and (e) requested that the Immigration and Naturalization Service find her absence under

the foregoing conditions was in compliance with section 307(b), Nationality Act of 1940.

On March 12, 1952, petitioner executed an immigration document entitled "Application for Permit to Reenter the United States." Petitioner therein requested a permit to reenter the United States as provided under section 10 of the Immigration Act of 1924, and alleged under oath, among other things, that: (a) She was an alien lawfully admitted to the United States for permanent residence; (b) her address was 3457 73d Street, Jackson Heights, New York; (c) the length of her intended absence from the United States was 1 year; (d) the country to be visited was French Morocco; (e) her reason for going abroad was a 1-year employment contract with the joint venturers; and (f) that her address abroad would be PUSOM, Casa Postale 879, Casablanca, French Morocco, North Africa.

On March 18, 1952, the Immigration and Naturalization Service issued petitioner a permit to reenter the United States, as provided by section 10 of the Immigration Act of 1924. This permit authorized reentry as a nonquota immigrant at any time within 1 year of original issuance, or until March 18, 1953.

On April 3, 1952, the date of her departure for French Morocco, petitioner executed an employees' withholding exemption certificate (Form W-4) in which her "home address" was disclosed as G.P.O., Box 987, New York, New York.

Before leaving for French Morocco, petitioner applied for death and dismemberment insurance in regard to travel from the United States to French Morocco, and the return trip to this country. In said application, petitioner's address is also disclosed as G.P.O., Box 987, New York, New York.

On April 3, 1952, petitioner departed from the United States for French Morocco where she remained until December 20, 1953. Her transportation expenses from New York City to the place of her employment were paid for by the joint venturers in accordance with the terms of her contract.

Under the terms of petitioner's employment contract she had several choices as to the method by which she could obtain payment for the services rendered by her. Petitioner could, in whole or part, receive payment by check drawn on a United States bank, or by receipt of French francs at the legal exchange rate. By letter dated April 7, 1952, petitioner directed the joint venturers to forward all of her paychecks to the Industrial Bank of Commerce, New York, New York, where she maintained a bank account which had not been closed upon her departure from the United States. Said letter specified that none of the petitioner's salary was to be paid in French francs.

Upon petitioner's arrival in French Morocco, construction of the barracks facilities at the jobsite provided by the joint venturers had not yet been completed. Pending completion of these facilities, petitioner was temporarily housed in a Casablanca hotel where she remained until May 20, 1952. In accordance with the terms of her contract, the joint venturers paid for the cost of this board and lodging in the amount of $281.63.

After May 20, 1952, petitioner was assigned to the airbase construction site at Nouasseur, French Morocco, which was located on the desert "far away from civilization." The housing and dining facilities provided by the joint venturers were situated on the military construction site itself and were of wood construction. Each barracks housed between 30 and 40 employees, contained one large room with shower facilities, and individual rooms shared by groups of two employees each.

The climate at the Nouasseur base "was quite hot and arid," especially in the summer, and petitioner found it "quite hard to take."

The airbase site at Nouasseur was primarily inhabited by personnel assigned to the military project, although there were "a few natives, a few huts, but no real center of any civilization."

Being a military project, there was a rule for all individuals entering the Nouasseur construction site to display proper identification. Petitioner was assigned an identification badge for this purpose.

By registered letter dated May 21, 1952, petitioner wrote to the Immigration and Naturalization Service, New York City, in regard to the "Affirmation of the benefits of Section 307(b), Nationality Act of 1940." Petitioner therein stated as follows:

With reference to the above particulars, and in accordance with your advice, I am making further inquiry regarding my status as an intended citizen of the United States.

Having completed, before my departure of the United States Form No. N–470, and sent same to you by registered mail on March 11, 1952, I am anxious to have confirmation of the fact that, as a government employee, time spent abroad will not be considered as a discontinuation of the 5 year residence in the United States necessary for my citizenship.

Due to the loss of some correspondence between petitioner and the Immigration and Naturalization Service she forwarded another "Application for Benefits of Section 307(b), Nationality Act of 1940 (Form N–470)" to the Immigration and Naturalization Service by registered letter dated June 30, 1952. She again alleged under oath in the June 30, 1952, application that: (a) She had been lawfully admitted into the United States on April 5, 1950, for permanent residence; (b) she resided in this country for 2 years after her April 5, 1950, entry; (c) her employment contract with the joint venturers required her presence in French Morocco beginning April 3, 1952,

for a "one year contract with the option of remaining for the completion of the project," and (d) that her absence from the United States was on behalf of the United States Government.

On October 6, 1952, the Immigration and Naturalization Service ordered that petitioner be granted the benefits of section 307(b) of the Nationality Act of 1940 on the grounds that petitioner was "an integral part of an organization which has a contract with the Government of the United States." Accordingly, it was held that petitioner fell within the "purview of the term 'employed by or under contract with the government.'"

By letter dated October 8, 1952, petitioner was advised that she had been granted the benefit of section 307(b) of the Nationality Act of 1940. The Immigration and Naturalization Service further cautioned her to review:

the provisions of Section 316(a) of the Immigration and Nationality Act, [of 1952] which becomes effective on December 24th, 1952, for consideration of the effect that it may have on any petition for naturalization filed by you subsequent to that date.

By letter dated October 29, 1952, the joint venturers wrote to the Immigration and Naturalization Service in order to clarify the Government's position with respect to the effect of section 316(a) of the Immigration and Nationality Act of 1952, in relation to any petition for naturalization filed by petitioner after December 24, 1952.

By letter dated December 18, 1952, addressed to the joint venturers, the Immigration and Naturalization Service advised as follows:

In reply to your letter of October 29, 1952, we wish to draw your attention to the fact that Sec. 316(c) of the Immigration and Nationality Act [of 1952] grants exception from the requirement of physical presence in the United States to people employed by, or under contract with, the Government of the United States, who have been granted the benefits of Section 316(b). No mention is made in this section of what effect is to be given to people so employed who have been granted the benefits of Sec. 307(b) of the Nationality Act of 1940 and this office has received no instructions or regulations clarifying the situation.

It would appear, however, on the facts in Miss Verrier's case, that her absence will not become material on the problem of physical presence in the United States unless she is absent for more than two and one-half years.

By registered letter dated January 7, 1953, petitioner requested that the Immigration and Naturalization Service grant a 6 months' extension of her reentry permit which would expire on March 18, 1953. Petitioner advised therein that: (a) Her United States address was 3457 73d Street, Jackson Heights, New York, New York; (b) she had departed from the United States on April 3, 1952; (c) the reason for the 6 months' reentry extension was the Government contract for the completion by the joint venturers of airbases in French Morocco, and (d) that her foreign address to which said permit is to be returned is

as follows: Miss Josette J. Verrier, c/o PUSOM, Boite Postale 879, Casablanca, French Morocco.

By letter dated March 3, 1953, the Immigration and Naturalization Service returned petitioner's reentry permit which had been extended to March 18, 1954.

By April 28, 1953, petitioner had already completed more than 1 year of overseas employment. Under the terms of her contract she was then entitled to the return of the $500 which had previously been withheld from her salary in regard to the return travel fund established by the joint venturers. On April 28, 1953, the $500 was returned to her.

By November of 1953, the joint venturers ceased their construction activities in French Morocco. Prior to December 18, 1953, the barracks facilities at the Nouasseur base were transferred by the joint venturers to military personnel, and petitioner moved into a Casablanca hotel for the remainder of her stay in French Morocco. During this period when housing and meal facilities were not provided on the construction site, the joint venturers provided petitioner with the amount of $20.

On December 17, 1953, petitioner's employment with the joint venturers was virtually completed. On that date, petitioner authorized her employer to send her salary check for the period December 1 through 15 to her United States bank. She further requested that her pay for December 16, 17, and 18, together with terminal leave then due, be paid to her by check negotiable only in the United States. At no time during the course of her employment with the joint venturers did she request payment in French francs. With the exception of her terminal leave, checks and salary payment for December 16, 17, and 18, 1953, were remitted to her United States bank.

During petitioner's overseas employment with the joint venturers she never paid any income taxes to the French Moroccan Government.

On December 18, 1953, petitioner terminated her employment with the joint venturers. The joint venturers thereupon issued an airplane ticket to her, paid for by them, to provide transportation between Casablanca and New York, with as many intermediate stops as would be permitted by the airline.

Petitioner used this airline ticket and left Casablanca by airplane on December 20, 1953, en route to Paris, France, with intermediate stops in Tangier, French Morocco, and Madrid, Spain. From January 9, 1954, to March 9, 1954, she visited with her parents at their home in Vichy, France. Her parents owned a 7-room house in Vichy, and one of the bedrooms had been set aside for petitioner's own use. The cost of petitioner's trip from Paris to Vichy and back to Paris was not reimbursed by the joint venturers.

On March 9, 1954, petitioner departed from London, England, and arrived in New York City, New York, on March 10, 1954.

Petitioner's reentry to this country on March 10, 1954, was within the time permitted by the reentry permit, as extended, which had previously been issued to her by the Immigration and Naturalization Service.

Upon her arrival on March 10, 1954, petitioner's baggage was examined by the United States Collector of Customs, Port of New York. In connection therewith, petitioner executed a baggage declaration and entry in which she alleged, *inter alia*, that: (a) Her home address was 3457 73d Street, Jackson Heights, 72, New York; and (b) she was a resident of the United States since April 5, 1950. This declaration was signed by petitioner in the space provided for returning United States residents. The statement of instructions attached to said declaration defines "residence" as follows:

2. Residence.—Persons arriving from foreign countries are divided into two classes for customs purposes: (1) Residents of the United States returning from abroad, and (2) all persons other than returning residents of the United States. Citizens of the United States, or persons who have formerly lived in the United States are residents thereof returning from abroad unless they have established a home elsewhere.

From the time that petitioner filed a declaration of intention to become a United States citizen in June 1951, continuing through the time of her reentry to this country on March 10, 1954, she always intended to become a United States citizen and to comply with the necessary laws.

When petitioner departed from this country for employment in French Morocco, she had no intention of becoming a permanent resident of French Morocco.

On June 21, 1955, petitioner executed a document with the Immigration and Naturalization Service, entitled "Application to File Petition for Naturalization." Petitioner alleged therein, *inter alia*, that: (a) She was lawfully admitted to the United States on April 5, 1950, for permanent residence; (b) since such lawful admission she was absent from this country from April 3, 1952, to March 10, 1954, under the benefits of section 307 (b) of the Nationality Act of 1940, and (c) that she had resided continuously in the United States since April 5, 1950, with the above exception "not counting as a break of residence."

On June 21, 1955, in the United States District Court for the Southern District of New York, petitioner filed a petition for naturalization as a United States citizen. Petitioner alleged therein that although she was absent from the United States for the period April 3, 1952, to March 10, 1954—

I have continuously resided in the United States since January 5, 1950, and continuously in the State in which this petition is made for a term of six months at

least immediately preceding the date of this petition, and I have been physically present in the United States for at least one-half of the five-year period immediately preceding the date of this petition.

Attached as part of the naturalization petition are the sworn affidavits of two witnesses who attested that Josette Verrier—

has resided immediately preceding the date of filing this petition in the United States continuously since the date last mentioned [September 1950] * * * [and] has been physically present in the United States for at least 31 months of that period * * *

On January 30, 1956, petitioner was granted United States citizenship.

With the exception of a 3- to 4-month period, petitioner has been physically present in the United States continuously from March 10, 1954, until the date of the instant hearing.

Petitioner's income tax returns for the taxable years involved reflect the following amounts of wages received for personal services rendered within the United States:

| Year | Amount |
|------|--------|
| 1952 | $900 |
| 1953 | 0 |

Petitioner received wages (before payroll deductions) for personal services rendered abroad during the taxable years 1952 and 1953, in the respective amounts of $3,102.01 and $4,983.71, which were not reported on her returns for said years.

During the years 1952 and 1953, the joint venturers withheld the respective amounts of $315 and $327 from petitioner's wages in consideration of the lodging, board, and other services and/or facilities provided at the site of employment. Said withholdings were computed at the rate of $1.50 per day.

During the year 1952, petitioner expended the amount of $533 for hotels, meals, tips, and baggage costs incident to the period April 3 through May 19, 1952. During 1953, petitioner expended the amount of $17 for hotel accommodations in Casablanca for the period December 16 through 20, 1953. In addition to wages, the joint adventurers provided petitioner with the following amounts incident to the cost of board and lodging when facilities therefor were not available on the employment site:

| 1952 | $281.63 |
| 1953 | 20.00 |

During the taxable year 1952, petitioner spent $875.72 for medical services received by her, of which $416.50 was reported on her return for that year. During the taxable year 1953, petitioner expended $100 for charitable contributions, $340.60 for medical expenses, and $50 for legal and accounting expenses, none of which amounts were reported on her return for that year.

On April 9, 1959, respondent mailed a statutory notice of deficiency to petitioner, determining deficiencies in income taxes for the taxable years 1952 and 1953 in the amounts of $684.77 and $906, respectively.

OPINION.

Respondent determined that petitioner was a resident alien of the United States during the taxable years 1952 and 1953, and, hence, the amounts received by her during that period as compensation from her employer in North Africa constituted taxable income. If petitioner were a nonresident alien during said years her earnings from sources without the United States would be excluded from gross income under section 212(a) of the 1939 Code.[1] As a resident alien of this country, however, petitioner would be taxed on her income in the United States, wherever earned. *Walter J. Baer*, 6 T.C. 1195, 1198 (1946). Petitioner maintains that her "residence" in the United States terminated April 3, 1952, when she went to French Morocco to work under an overseas employment contract, and, therefore, her wages received while working abroad were exempt from taxation.

Treasury Regulations 118, sec. 39.211, applicable to the question before us, upon which respondent relies, are printed in the margin,[2] and have often been cited with approval by our Court and other courts as a practical implementation of the law. *Ceska Cooper*, 15 T.C. 757, 763 (1950).

---

[1] SEC. 212. GROSS INCOME.

(a) GENERAL RULE.—In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States.

[2] Regs. 118.

Sec. 39.211-1 *Taxation of aliens in general.* For the purposes of chapter 1, alien individuals are divided generally into two classes, namely, resident aliens and nonresident aliens. Resident aliens are, in general, taxable the same as citizens of the United States, that is, a resident alien is taxable on income derived from all sources including sources without the United States. Nonresident aliens are taxable only on income from sources within the United States. * * *

Sec. 39.211-2 *Definition.* * * *

(b) An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States * * *. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. * * * An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident * * *, in the absence of exceptional circumstances.

Sec. 39.211-4 *Proof of residence of alien.* (a) The following rules of evidence shall govern * * *. An alien, by reason of his alienage, is presumed to be a nonresident alien. Such presumption may be overcome—

* * * * * * *

(2) by (i) proof that the alien has filed a declaration of his intention to become a citizen of the United States under the naturalization laws, * * * or (iii) proof of acts and statements of an alien showing a definite intention to acquire residence in the United States * * *.

Sec. 39.211-5 *Loss of residence by alien.* An alien who has acquired residence in the United States retains his status as a resident until he abandons the same and actually departs from the United States. An intention to change his residence does not change his status as a resident alien to that of a nonresident alien. Thus, an alien who has acquired a residence in the United States is taxable as a resident for the remainder of his stay in the United States.

At the outset, it may be noted that for income tax purposes, "residence" is not synonymous with "domicile." It is something less. An individual may have a domicile in one place and a residence in another, and may also have more than one residence. Regs. 118, sec. 39.211-2. *Bowring* v. *Bowers*, 24 F. 2d 918, 923 (C.A. 2, 1928), certiorari denied 277 U.S. 608 (1929); *Frederick Rodiek, Ancillary Executor*, 33 B.T.A. 1020, 1031-1032 (1936), affd. 87 F. 2d 328 (C.A. 2, 1937). Moreover, the mere fact of absence for a relatively long period of time does not, of itself, destroy an alien's status as a resident of the United States for income tax purposes. After an alien has once established residence in the United States, it is presumed to continue until shown to have changed. Regs. 118, sec. 39.211-5. *Federico Stallforth*, 30 B.T.A. 546, 550 (1934), affd. 77 F. 2d 548 (App. D.C. 1935), certiorari denied 296 U.S. 606. Whether petitioner was a resident of the United States during the taxable years involved is primarily a question of fact to be determined from her intent. *Walter J. Baer, supra* at 1198.

Preliminarily, we note that petitioner concedes that she had become a resident alien of the United States prior to her departure in 1952 for French Morocco. Also, petitioner admits that during her physical absence from this country in 1952 and 1953, she "maintained * * * [a New York City] address and considered the United States as her domicile."

In essence, petitioner contends that when she departed from the United States in April 1952, she had terminated her affairs here and abandoned the previous residence she had established in the United States. Petitioner argues, on brief, that she intended to relinquish her residence in this country when she departed for North Africa because she was confident that her job with the Porter-Urquhart firm would satisfy the exception requirements of the Immigration and Naturalization Service, since said company was doing work for the United States, and, therefore, she was not required to reside continuously in the United States.

Upon consideration and application of the governing legal principles and regulations to the facts before us, we conclude that during the years 1952 and 1953, petitioner was a resident of the United States for income tax purposes. The record is replete with petitioner's declarations under oath that her entry into this country on April 5, 1950, was for the purpose of permanent residence. Petitioner's sworn statements from December 1949 when she first took steps to immigrate to the United States, until the date of the instant proceeding, clearly demonstrate that she never, either by act or declaration, revealed any intention of returning to her native country or abandoning residence in the United States during any period here material, including, of

course, the years 1952 and 1953. In December 1949, petitioner, who had been working 3 years in Germany, applied for an immigrant visa from the American consulate in Munich, Germany, wherein she alleged under oath that she desired to immigrate to the United States for purposes of "permanent residence."[3] Petitioner's conduct during the 2 years following her entry into this country on April 5, 1950, corroborates her expressed intention to establish a permanent residence in the United States. In addition to living at the same address in Jackson Heights, New York, for at least 21 months, and holding a responsible position as executive secretary to a domestic firm for about 20 months, on June 6, 1951, petitioner filed a declaration of intention to become a United States citizen.[4]

It is significant, also, that petitioner admitted at the trial that from the time she filed her declaration of intention in June 1951 and continuing through to the time of her reentry to this country on March 10, 1954, she always intended to become a United States citizen and to comply with the statutory requirements of section 307 of the Nationality Act of 1940.[5]

As already noted, residence once acquired by an alien in the United States is not lost except through physical departure coupled with evidence indicating an intention to abandon such residence. Regs. 118, sec. 39.211–5; I.T. 4057, 1951–2 C.B. 93, as modified by Rev. Rul. 60–129, 1960–1 C.B. 272. In our view, petitioner's absence from the United States from April 3, 1952, until March 10, 1954, was not intended to, and did not, constitute an abandonment of her United States residence.

---

[3] As defined by the immigration laws in Act of June 27, 1952, ch. 477, title I, sec. 101, 66 Stat. 166, 8 U.S.C. 1101(a)(20) lawful admission for permanent residence means (p. 169):

\* \* \* \* \* \* \*

the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.

[4] As of June 6, 1951, one of the prerequisites of naturalization was the filing of "first papers," or a declaration of intention to become a United States citizen. Act of May 31, 1947, ch. 87, sec. 1, 61 Stat. 121 (formerly 8 U.S.C. sec. 731).

[5] Section 307, Act of October 14, 1940, ch. 876, title I, subch. III, 54 Stat. p. 1142, sets forth the then-applicable naturalization laws, in pertinent part, as follows:

Sec. 307. (a) No person, \* \* \* shall be naturalized unless such petitioner, (1) immediately preceding the date of filing petition for naturalization has resided continuously within the United States for at least five years \* \* \*.

(b) \* \* \* Absence from the United States for a continuous period of one year or more during the period for which continuous residence is required for admission to citizenship, immediately preceding the date of filing the petition for naturalization \* \* \*, shall break the continuity of such residence, *except that in the case of an alien who has resided in the United States for at least one year, during which period he has made a declaration of intention to become a citizen of the United States, and who thereafter is employed by or under contract with the Government of the United States \* \* \*, no period of absence \* \* \* shall break the continuity of residence if*

(1) Prior to the beginning of \* \* \* [such absence from the United States] the alien has established to the satisfaction of the Attorney General that his absence \* \* \* is to be on behalf of \* \* \* [the United States] Government \* \* \*, and [Emphasis added.]

Analysis of the numerous steps taken by petitioner prior to accepting the North African employment, and during her sojourn abroad, as set forth in our Findings of Fact *in extenso*, makes it clear that she took all measures possible to preserve and safeguard her status as a resident of the United States, and to assure her reentry into this country without the necessity of first obtaining a nonquota immigrant visa. Significantly, before accepting the job in French Morocco, petitioner took the precaution of requesting a determination from the Immigration and Naturalization Service that her absence from this country would qualify under section 307 of the Nationality Act of 1940. Obviously, petitioner was not taking any chance of noncompliance with the residence requirements necessary for her United States citizenship.

Additional indicia of petitioner's intention to retain her status as a resident of the United States during her employment in North Africa includes the fact that during the taxable period she maintained a bank account in New York City which had not been closed at the time of her departure from this county. With the exception of her terminal leave checks and salary payments from December 16 to 18, 1953, all of petitioner's overseas pay checks were remitted to her New York City bank pursuant to instructions given to her employer. Checks which were not sent to her bank were negotiable only in the United States. Though, of course, not conclusive, we note also that she never established any residence in any other place during her absence from New York City, and did not pay any taxes to any foreign country or countries during the years involved.

The further extent to which petitioner maintained her ties to the United States during her absence abroad is revealed by the correspondence which she had with the Immigration and Naturalization Service, in which she reiterated her intent to become a citizen of this country. In this connection, prior to her departure from the United States in April 1952, petitioner had not yet received a reply to her request for the benefits of section 307(b) of the Nationality Act of 1940 and, accordingly, on May 21, 1952, in furtherance of her intent, mailed a letter to the Immigration Service in which she stated, *inter alia*, that:

I am making further inquiry regarding my status as an *intended citizen of the United States*. Having completed before my departure \* \* \* form No. N–470 [application for benefits of section 307(b)] and sent same to you by registered mail on March 11, 1952, *I am anxious to have confirmation* of the fact, that as a government employee, *time spent abroad will not be considered as a discontinuation of the five year residence in the United States necessary for my citizenship*. [Emphasis added.]

Manifestly, if petitioner actually regarded Vichy, France, as her true "home" as she urges, and intended to abandon her residence in

this country during her sojourn in North Africa, she would not have so diligently complied with the sundry immigration and naturalization requirements involved in obtaining her citizenship status in the United States. Petitioner's "floating" intention, indefinite as to time, to return to her original domicile in Vichy, France, did not prevent her from becoming a resident of the United States and remaining in that status. *Swenson* v. *Thomas*, 164 F. 2d 783–785 (C.A. 5, 1947). It is noteworthy that upon petitioner's return to this country on April 10, 1954, when her baggage was examined by United States Customs officials, she signed the baggage declaration and entry form in the space provided for a "Returning United States Resident," and alleged therein under oath that her home was in New York, and that she had been a resident of the United States since April 5, 1950.

A further indication of such intention is found in the fact that except for about 3 months, petitioner has been continuously present within this country from March 10, 1954, until the date of the instant trial, and her many years of careful planning were fulfilled on January 30, 1956, when she acquired her United States citizenship.

We find no merit in petitioner's argument, on brief, that earned income from sources outside the United States is exempt from taxation under section 116(a) of the 1939 Code when a United States citizen is a bona fide resident of a foreign country, and that Congress did not intend to treat aliens more harshly than citizens of this country. Suffice it to say that the exclusion provisions of section 116(a), *supra*, are available only to United States citizens and petitioner was an alien during the years involved. *L. E. L. Thomas*, 33 B.T.A. 725, 737 (1935); *Federico Stallforth*, *supra* at 551. See *Herman Frederick Baehre*, 15 T.C. 236, 242 (1950).

In *L. E. L. Thomas*, *supra*, an alien residing in the United States went to Russia for a period of 4 years under a contract of overseas employment. Although the taxpayer never actually became a United States citizen, his absence from this country was not regarded as an abandonment of United States residence. Holding against the taxpayer's contention that he had changed his status from that of "resident alien" to that of a "nonresident alien," we concluded that the salary he received during the taxable year for services performed in Russia constituted taxable income. In the course of the opinion, we said (pp. 736–737):

In order to avail himself of the provisions of the immigration laws and obtain an easy reentry into the United States the petitioner held himself out to the immigration authorities as one who had been admitted to the United States for permanent residence and represented that in going abroad he was not abandoning the residence and domicile established here, but was going abroad temporarily and would return just as early as his business engagement, the duration of which was fairly definitely fixed, would permit. Having thus held

himself out and satisfied the immigration officials that his absence was to be only temporary and thereby having obtained the benefits of his action, we think he is to be bound by it. Little weight is to be given statements that he now makes to the effect that his intentions then were contrary to what his acts purported them to be.

The facts in the instant case are distinguishable from those present in *D. L. Philippe*, 26 T.C. 984 (1956), and *Ernest Goldring*, 36 B.T.A. 779 (1937). Unlike the instant case, in *D. L. Philippe, supra*, the critical issue presented was whether the alien taxpayer had ever acquired residence in the United States. Because of grief and transient periods of physical presence in this country, prior to sustained absences of at least 4 years' duration, we found that the taxpayer was a nonresident during his absence from the United States. In *Ernest Goldring, supra*, we held that the taxpayer was a resident alien of the United States during the period January 1 to May 24, 1933, and was a nonresident alien during the balance of the year. In holding that the taxpayer was a nonresident alien from May 25, 1933, to the end of the year, we stated that on May 24, 1933, taxpayer and his wife packed up their possessions and departed from the United States, with the definite intention of taking up residence in Canada and that they carried out that intention. In the instant case the evidence falls far short of establishing an intention to change residence.

In the light of all of the foregoing circumstances, we sustain respondent's determination that petitioner was a resident alien during the periods in issue.

Alternatively, petitioner contends that if we conclude that she was a resident alien during the taxable years, the funds expended by her abroad for meals, lodging, transportation, tips, and miscellaneous expenses constitute travel expenses "while away from home" under sections 22(n)(2) [6] and 23(a)(1)(A) [7] of the 1939 Code. Petitioner avers that while overseas during 1952, she expended $1,130 for hotels, meals, tips, baggage, and transportation costs; and that during 1953 she spent $1,060 for travel, meals, and lodging; and that these ex-

---

[6] SEC. 22. GROSS INCOME.

(n) DEFINITION OF "ADJUSTED GROSS INCOME."—As used in this chapter * * * "adjusted gross income" means the gross income minus—

* * * * * * *

(2) EXPENSES OF TRAVEL AND LODGING IN CONNECTION WITH EMPLOYMENT.—The deductions allowed by section 23 which consist of expenses of travel, meals, and lodging while away from home, paid or incurred by the taxpayer in connection with the performance by him of services as an employee;

[7] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging), while away from home in the pursuit of a trade or business; * * *

penditures were exclusively for the employer's benefit since they enabled her to live at the jobsite which was far from the comforts of civilization.

Section 22(n)(2) read in connection with section 23(a)(1)(A) provides, *inter alia*, for the deduction of ordinary and necessary "traveling expenses (including the entire amount expended for meals and lodging) while away from home" in connection with the performance of services as an employee. One of the conditions which must be satisfied before a deduction is allowable for traveling expenses is that the taxpayer must show that the expenses were incurred "while away from home." *Commissioner* v. *Flowers*, 326 U.S. 465 (1946), rehearing denied 326 U.S. 812. In applying this prerequisite, we have held that a determination of resident status in the national sense does not require a corollary finding that the taxpayer was "away from home" within the intendment of the statute for the purpose of determining the deductibility of expenses of travel abroad. See *Arthur J. H. Johnson*, 7 T.C. 1040, 1051 (1946); *Virginia Ruiz Carranza (Zuri)*, 11 T.C. 224–226 (1948).

Expenses of meals and lodging at the place of a taxpayer's principal employment are nondeductible personal expenses. Similar expenses incurred while temporarily employed away from home are deductible traveling expenses within the meaning of the statute. If the employment, while allegedly away from home, is in fact for an indefinite, or indeterminate, rather than a temporary period, the situs of such employment for purposes of the statute becomes petitioner's tax home and expenses of meals and lodging there incurred are not deductible. *Kermit L. Claunch*, 29 T.C. 1047, 1052 (1958), affd. 264 F. 2d 309 (C.A. 5, 1959); *Commissioner* v. *Peurifoy*, 254 F. 2d 483 (C.A. 4, 1957), affd. 358 U.S. 59 (1958). The issue for our decision is whether or not, during the taxable period involved herein, petitioner in performing her services as an employee in French Morocco was in fact away from home within the meaning of the statute. G.C.M. 23672, 1943 C.B. 66.

This presents primarily a question of fact. *Harry F. Schurer*, 3 T.C 544, 546 (1944). In many instances, it is difficult to harmonize the decided cases. Our view is succinctly stated in *James R. Whitaker*, 24 T.C. 750, 753 (1955), in which, quoting from *Raymond E. Kershner*, 14 T.C. 168 (1950), we said, in pertinent part (p. 174): "For purposes of the statute, a taxpayer's home means his place of business, employment, or post or station at which he is employed." To the same effect, see *Barnhill* v. *Commissioner*, 148 F. 2d 913, 916 (C.A. 4, 1945), affirming a Memorandum Opinion of this Court; *Harold R. Johnson*, 17 T.C. 1261, 1263 (1952).

Respondent contends that petitioner's "home" during the taxable period in the tax sense was in French Morocco. Petitioner, on the

other hand, urges that her home during the years involved was in Vichy, France, where her parents resided, and that her employment in French Morocco was "temporary." In our opinion, from the time petitioner entered upon her duties in French Morocco, her place of employment was French Morocco, and her employment was not in the nature of a temporary employment. It follows, therefore, that her "home" for tax purposes was in French Morocco during the period involved. While no definite period of employment was assured to petitioner under the terms of her overseas employment contract, there is no evidence that her job in North Africa was to be terminated at the end of a brief period of time.

We think that petitioner's employment in French Morocco was not the kind of employment to be deemed temporary in character. It is our view that it was of indefinite duration, as set forth in the employment contract, at least "twelve (12) months' continuous employment" was contemplated by the employer, and petitioner in fact spent from April 3, 1952, to December 18, 1953, or approximately 600 days in French Morocco. The substantial and actual duration of petitioner's employment in French Morocco indicates its indefiniteness. *Beatrice H. Albert*, 13 T.C. 129, 131 (1949); *James R. Whitaker*, *supra* at 753–754. See *Michael J. Carroll*, 20 T.C. 382 (1953) where we held that a taxpayer employed by the War Department on an appointment of indefinite tenure for about a year in Korea could not deduct expenses of meals and lodging while in Korea since Korea was his principal place of employment, and, therefore, he was not "away from home."

We have carefully reviewed *Laurence P. Dowd*, 37 T.C. 399 (1961), which is in some respects similar to the instant case. We find that it is distinguishable, however, and not here controlling. In *Dowd*, the taxpayer took sabbatical leave as a Fulbright lecturer which in itself connotes that the period of his absence was by its own nature intended to be temporary in character. Morever, in *Dowd*, the taxpayer was a university professor who intended to resume teaching in the United States upon termination of the Fulbright grant. Petitioner herein had no such focus of business or professional activity in this country. Furthermore, in *Dowd* the taxpayer retained ownership of the property which he and his family had occupied, renting it for the period during which he expected to be away, again a factor not here present.

Upon the record in the instant case, we must conclude that during the period in question, petitioner was not away from home in the performance of services as an employee within the ambit of the statute, and we sustain respondent's position in this respect.

Under the circumstances, there is no occasion for us to consider the extent to which petitioner has substantiated the amounts of her ex-

penditures which she claims as deductions. Since we have held that she was not away from home, it necessarily follows that the amounts paid by her for hotels, meals, transportation, baggage expense, and tips, were clearly personal, and none are deductible.

For completeness, we call attention to the fact that no issue was raised with respect to section 22(n)(3). Moreover, there is no evidence that petitioner included any reimbursed expenses in gross income. Whether or not petitioner was entitled to further reimbursement is not an issue for our consideration.

Any adjustments required pursuant to stipulation of the parties will be disposed of in the Rule 50 computation.

*Decision will be entered under Rule 50.*